UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CELINA MONTOYA, ZACHARY BLAYE, and RONALD MOLINA, individually and on behalf of all others similarly situated, | ) ) ) | 18 C 1991 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| ROB JEFFREYS, in his official capacity as Acting Director of the Illinois Department of Corrections, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Celina Montoya, Zachary Blaye, and Ronald Molina, all serving mandatory supervised release ("MSR") terms following their state court sex offense convictions, bring this putative class action under 42 U.S.C. § 1983 against Rob Jeffreys in his official capacity as Acting Director of the Illinois Department of Corrections ("IDOC"), alleging that an IDOC policy prohibiting them from having contact with their minor children without prior approval violates their Fourteenth Amendment due process rights. Doc. 92. (The claims of a fourth plaintiff, Jennifer Tyree, were dismissed by agreement as moot. Doc. 155.) Plaintiffs seek only declaratory relief and an injunction against IDOC's enforcement of its policy, not damages. Doc. 92 at ¶¶ 86, 88.

Earlier in the litigation, the court enjoined enforcement of IDOC's prior parent-child contact policy, Doc. 33, and denied IDOC's motion to dismiss the initial complaint's substantive due process claim, Docs. 63-64 (reported at 2019 WL 296556 (N.D. Ill. Jan. 23, 2019)). Plaintiffs then filed an amended complaint directed against IDOC's current policy. Doc. 92. The court denied IDOC's motion to dismiss the amended complaint, but ordered supplemental

1

briefing on whether Montoya's and Blaye's claims are moot given that IDOC granted them permission to see their children. Docs. 138-139 (reported at 2020 WL 4464672 (N.D. Ill. Aug. 4, 2020)).

The parties' supplemental briefs, with IDOC seeking dismissal under Rule 12(b)(1) of Montoya's and Blaye's claims and Plaintiffs opposing dismissal, are before the court. Docs. 144, 145, 150, 151. Also before the court is Plaintiffs' motion for class certification. Doc. 93. Montoya's and Blaye's claims may proceed, and Plaintiffs' class certification motion is granted in part.

## Background

IDOC raises a factual challenge to subject matter jurisdiction under Rule 12(b)(1) in that it relies on evidence outside the pleadings to contend that Montoya's and Blaye's claims are moot. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) ("A factual challenge contends that there is in fact no subject matter jurisdiction, even if the pleadings are formally sufficient.") (citation and emphasis omitted). In considering that challenge, the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (internal quotation marks omitted).

Plaintiffs' class certification motion also requires the court to look beyond the pleadings. "Unlike a motion under Federal Rule of Civil Procedure 12(b)(6), a motion to certify a class under Rule 23(c) is not one for which the court may simply assume the truth of the matters as asserted by the plaintiff. Instead, if there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class." *Priddy v. Health*

*Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (citation, alterations, and internal quotation marks omitted). Still, "[i]n conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).

### A.    IDOC Policy

Plaintiffs are parents of minor children. Doc. 147 at ¶ 7. Each is serving a term of MSR, a nondiscretionary form of parole, after having been convicted in Illinois state court of crimes for which they must register as sex offenders. *Id*. at ¶¶ 2, 7. The Illinois MSR statute provides that registered sex offenders must, during their MSR terms, "refrain from all contact, directly or indirectly, personally, by telephone, letter, or through a third party, with minor children without prior identification and approval of an agent of [IDOC]." 730 ILCS 5/3-3-7(b-1)(9). In nearly identical terms, the Illinois Prisoner Review Board, the body responsible for setting MSR conditions, imposes on Plaintiffs what the parties call "the Contact Condition," which states: "You shall refrain from all contact, directly or indirectly, personally, by telephone, letter, or through a third party, with minor children without prior identification and approval of an agent of [IDOC]." Doc. 92 at ¶ 13 (emphasis omitted). Plaintiffs challenge not the Contact Condition itself, but rather IDOC's policy implementing it as to their contact with their own children. 2019 WL 296556, at *3-4.

After the court enjoined IDOC's prior parent-child contact policy, which implemented the Contact Condition by imposing an automatic six-month ban on sex offenders' contacts with their own children upon their release to MSR, Doc. 33, IDOC adopted its current policy, Doc. 147 at ¶¶ 17-18; Doc. 134-1. Under the current policy, sex offenders released to MSR still must obtain IDOC's permission before contacting their minor children. *Id*. at 2-3. IDOC Deputy Chief of Parole Dion Dixon, Doc. 128-13 at 40, testified in a deposition that the only exception

to this rule is a court order allowing parent-child contact, Doc. 134-3 at 2. Absent such a court order, a parolee must seek permission from her "containment team," a group of IDOC employees assigned to the parolee to ensure "public safety and community and victim protection" through "open communication and coordination of services." Doc. 134-1 at 10.

For the first step of the permission process, the parolee meets with a therapist within 14 days of release from prison. *Id*. at 2. The parolee's therapist and parole agent must determine within 21 days of that meeting "whether there is reasonable cause to believe that the parolee's child(ren) would be endangered by parent-child contact." *Ibid*. In making such decisions, the "parole agent shall give considerable weight to the therapist's recommendation." *Ibid*. Adding the 14-day and 21-day periods together, the policy allows IDOC to withhold parent-child contact for up to 35 days without determining that contact would endanger the minor child.

A "Safety Plan" jointly developed by the containment team and the parolee must be in place before parent-child contact is approved. *Id*. at 2. The safety plan template attached to the policy requires identifying a chaperone, setting forth the location and time of parent-child visits, and the parolee's initialed acknowledgement of twenty rules and conditions. *Id*. at 6-8. If parent-child contact is restricted or prohibited, the parole agent and therapist must "give the reasons for the restriction or prohibition briefly in writing." *Id*. at 2-3. The restriction or prohibition "will automatically be reviewed by the therapist and parole agent **every 28 days**," and if contact is again restricted or denied, "reasons will be provided briefly in writing." *Id*. at 3.

The form that IDOC uses to respond in writing to parolees' requests to contact their children lists eleven specified reasons for denial, plus a twelfth category labeled "other" with space for explanation. *Id*. at 4. Many of the eleven specified reasons have a clear connection to the child's safety—for instance, that the child was a victim of the parent's crimes, or that a child

welfare investigation is pending.  *Ibid*.  Other reasons, however, merely reflect IDOC's professed inability to reach a determination: insufficient therapy sessions to make an assessment; unavailable polygraph results; the need for psychiatric assessment; or an incomplete safety plan. *Ibid*.  As just noted, parent-child contact also can also be denied for a reason not specified on the IDOC form; as Dixon testified, sex offender therapists have a general "ability to state an objection over allowing contact."  Doc. 134-3 at 4.  There is no limit on how long a therapist can refuse permission for a parolee to see her children.  *Ibid*.

Obtaining permission to contact a child can impose substantial financial costs on the parolee.  Parolees are responsible for paying their therapists to prepare the required safety plan, Doc. 134-3 at 5; for example, Molina attests that he pays $40 per week to his therapist, Doc. 128-5 at ¶ 10.  One therapist identified being "behind on payment" as a reason he might decide the parolee is not "in good standing with therapy."  Doc. 134-4 at 2.  That therapist also said he would want a parolee to be in therapy for "five, six, seven months" before he would recommend contact with a minor child.  *Id*. at 3.  Another therapist estimated the necessary course of therapy at "[a]t least a year."  Doc. 134-5 at 2.  In addition, both IDOC policy and therapist practices require parolees to take a polygraph examination before they may see their children, though the requirement can be waived in individual cases.  Doc. 134-1 at 6; Doc. 134-3 at 6; Doc. 134-4 at 2; Doc. 134-5 at 2.  The parolee must pay for the examination, which Dixon testified costs between $200 and $400.  Doc. 134-3 at 9.

The experience of Brandon Velna, an absent putative class member, illustrates how the need for therapist approval can lead to repeated denials of parent-child contact.  Velna was released from prison to MSR in August 2019, and he asked for permission to have contact with his minor children.  Doc. 152-1 at ¶¶ 1, 4.  IDOC denied his request, sending him denial forms in

October and December 2019 identifying insufficient therapy sessions and an incomplete safety plan as grounds. Doc. 152-2 at 9-10. In February 2020, Velna passed a polygraph examination, and in March he received permission to speak with his children by phone—seven months after his release from prison. Doc. 95-2 at 1; Doc. 158-1 at 2.

Since then, Velna has unsuccessfully sought permission to see his children in person. As of September 9, 2020, he had attended 48 counseling sessions, but his therapist still withheld her support for in-person contact. Doc. 158-4 at 2. The therapist noted that Velna had been untalkative at his group sessions, sharing details about his week but not "expressing his own personal struggles." *Ibid*. Many of Velna's IDOC denial forms from March 2020 onward simply report, without explanation, his therapist's disapproval: "Treatment provider is not willing to sign child safety plan at this time" (March 8); "Treatment provider does not support child contact at this time" (June 24); "Treatment provider does not support contact with children at this time" (July 22); "Treatment provider has not indicated that she supports in person child contact at this time" (August 30). Doc. 152-2 at 1-3, 7.

A parolee may seek review of an adverse decision "from the Deputy Chief of Parole," currently Dixon, and either he "or his/her designee" must "respond in writing **within 21 days.**" Doc. 134-1 at 3. Only one such response is in the record, on an appeal taken by Velna on March 3, 2020 and denied 28 days later. Doc. 158-2 at 28-29. The denial was signed by Sarah Brown-Foiles, the IDOC sex offender coordinator. *Ibid*.; Doc. 134-6 at 3. It thus appears that Dixon has named Brown-Foiles as his designee for responding to parent-child contact appeals. Dixon's testimony that he and Brown-Foiles together "make a determination" when "the containment team is not in agreement" on a parent-child contact decision further supports that inference.

Doc. 134-3 at 4. Beyond a request for review from Dixon and Brown-Foiles, there is no opportunity for further appeal. Doc. 134-1 at 3.

Even if a parolee is granted permission to see her children, that permission is revocable. The IDOC's policy states that, if parent-child contact is approved, the containment team will "continually assess the safety plan and address any issues as long as visitation is permitted." *Ibid*. Parole agents are to "make unannounced visits during the visitation sessions and provide ongoing assessments," *id*. at 2, and the containment team may, by "collective agreement," suspend visitation. *Id*. at 3. The policy allows for the possibility of "reinstatement" of visitation, but it does not set forth the requirements for reinstatement. *Ibid*.

### B. Ronald Molina

Molina has a sixteen-year-old son, G.S. Doc. 147 at ¶ 20. In 2008, Molina was convicted of criminal sexual assault against a fifteen-year-old female. *Id*. at ¶ 21. Molina has never been accused of abuse or misconduct toward G.S. or been the subject of a child welfare investigation. Doc. 147 at ¶ 24; Doc. 128-5 at ¶ 11. G.S.'s mother has agreed to supervise Molina's visitation with G.S. if it is approved. Doc. 128-5 at ¶ 7.

The complaint alleges that Molina had regular contact with his son before going to prison, Doc. 92 at ¶ 22, though Molina attests in an interrogatory response that he did not see G.S. in person because G.S. lived in Philadelphia with his mother, Doc. 128-5 at ¶ 12. The complaint further alleges that Molina, while imprisoned, remained in contact with G.S. through phone calls, visits, and letters. Doc. 92 at ¶ 23. IDOC asserts that Molina did not even know in 2008 that he had a son, pointing out that he entered "0" for the number of "children & other dependents" on the offender financial status report he completed that year. Doc. 128 at 3; Doc. 128-6 at 2-3. But the financial status report does not establish that Molina did not know about G.S., for if, as Molina attests, G.S. was living with his mother, it may have been sensible

7

for him not to list G.S. as a "dependent" on the form. In any case, this factual dispute does not affect the outcome of the class certification motion.

Molina was released from prison to MSR in September 2018. Doc. 147 at ¶ 25. He sought information before his release about having contact with his son, Doc. 128-5 at ¶ 7, and he sought permission from his parole agent in February or March 2019, Doc. 147 at ¶ 27. To this day, Molina remains prohibited from having contact with his son. *Id*. at ¶ 25.

Molina has attended weekly therapy sessions since his release. Doc. 128-5 at ¶ 5; Doc. 134-4 at 5. Molina's therapist reported to IDOC that he has "shown good attendance, timeliness and payment for services," and that he "does contribute, reasonably, to the group discussions." Doc. 129 at 15. The therapist has declined to approve parent-child contact, however, because Molina has not undergone "a sexual history polygraph," which is "standard policy" for the therapist's sex offender treatment program. *Ibid*. At his deposition, the therapist explained that "[t]hat's what's holding [Molina] up right now." Doc 134-4 at 5. The therapist testified that he "wouldn't have a real strong objection" to phone contact, but he is still reluctant to waive the polygraph, "given that's been put on [Molina] as a requirement." *Id*. at 6. IDOC's internal notes from June 2019 confirm that Molina was not "allowed to see his underage son … due to not taking a mandated polygraph." Doc. 129 at 4-5.

Molina has explained to his therapist, parole agent, and Brown-Foiles that he cannot afford the polygraph examination. Doc. 128-5 at ¶¶ 7, 9; Doc. 129 at 15. The therapist has insisted on Molina fulfilling this requirement because he does not want it to seem that Molina is "being given special favors." Doc. 134-4 at 6. Consequently, since his release, Molina has been prohibited from having contact with G.S. Doc. 128-5 at ¶¶ 17-18.

### C.     Celina Montoya

Montoya has three children, the youngest of whom, L.M., is fifteen years old.  Doc. 92 at ¶ 63.  Montoya was convicted in 2015 of criminal sexual assault against a fourteen-year-old male student at the school where she taught.  *Id*. at ¶ 64.  Before going to prison, Montoya was a custodial parent of her children, and while she was incarcerated her children and husband visited her and talked to her by phone.  *Id*. at ¶ 65; Doc. 128-1 at ¶ 14.  Montoya has never been the subject of a child welfare investigation.  *Id*. at ¶¶ 12-13.

While in prison, Montoya submitted a grievance with prison officials seeking permission to live with her children upon her release to MSR.  Doc. 128-2 at 2.  The grievance was denied as "not grievable" within the prison system.  Doc. 92 at ¶ 74.  Around the same time, Montoya moved her sentencing court to amend her sentence to allow contact with her minor children upon her release.  Doc. 128-14 at ¶ 2.  The sentencing court granted her request in March 2017, and Montoya's amended mittimus permits her "to have contact with her biological children (who are minors) while on [MSR]."  Doc. 128-4 at 2-3.

Montoya was released to MSR in April 2019.  Doc. 92 at ¶ 71.  She initially received permission from her parole agent to live with her husband and children, but the day after her release a different parole agent came to the family home and told her she was not permitted to live there.  Doc. 128-1 at ¶ 16.  Montoya moved out, though she was allowed to have regular in-person contact with her children.  *Ibid*.  Montoya attributes these mixed signals to "confusion with my parole host site," adding that "our family home did not meet the approval of our local police department, so I could not reside there."  *Id*. at ¶ 17.  The family purchased a new home in August 2019, and Montoya was allowed to move in with her husband and children and has lived there without interruption since then.  *Ibid*.

### D.     Zachary Blaye

Blaye is the father of a thirteen-year-old son, Z.M.  Doc. 92 at ¶ 40.  Blaye was convicted in 2009 of criminal sexual assault against an adult woman.  *Id*. at ¶ 41.  Before going to prison, Blaye shared custody of Z.M. with Z.M.'s mother.  Doc. 128-8 at ¶ 12.  While in prison, Blaye remained in frequent contact with Z.M. by phone.  Doc. 92 at ¶ 42.  Blaye has never been the subject of a child welfare investigation.  Doc. 128-8 at ¶ 11.

Blaye was released from prison to MSR in June 2019.  Doc. 92 at ¶ 44.  The complaint alleges that Blaye immediately sought permission to talk to his son.  *Id*. at ¶ 45.  But his parole agent testified that the request came months later, in November 2019.  Doc. 134-6 at 2.  The parole agent's notes corroborate the later date.  Doc. 129 at 13.  At some point, Blaye underwent a polygraph examination, which cost him $370, though he is not required to pay for his weekly therapy visits.  Doc. 128-8 at ¶ 9.

In November 2019, IDOC approved Blaye's request for phone contact with Z.M.  Doc. 128-11 at 2.  Blaye spoke by phone with Z.M. approximately every other day during December 2019 and January 2020.  Doc. 128-8 at ¶ 17.  On January 27, 2020, Blaye was permitted to have his first in-person visit with Z.M.  *Id*. at ¶ 18.  Regular in-person visits continued until the COVID-19 pandemic began, at which point Blaye, who contracted the disease, voluntarily ceased the visits.  *Id*. at ¶ 19.  Blaye plans to resume in-person visits when it is safe to do so.  *Ibid*.

### Discussion

## I.     Standing and Mootness

As noted, the court sought supplemental briefing on whether Montoya's and Blaye's claims are moot given that they now have permission to see their children in person.  2020 WL

4464672, at *3. Contrary to the court's initial view, the potential case-or-controversy issue with Blaye's claims (though not Montoya's) relate to standing, not mootness.

The standing and mootness doctrines both turn on whether the plaintiff has a "personal stake" in this case, meaning a "legally cognizable interest in the outcome." *Loertscher v. Anderson*, 893 F.3d 386, 392 (7th Cir. 2018) (internal quotation marks omitted). The difference between the two doctrines is one of timing. Standing turns on the state of events "at the commencement of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *see also Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of the City of Milwaukee*, 708 F.3d 921, 928 (7th Cir. 2013) ("Standing is evaluated at the time suit is filed."). Mootness, by contrast, requires that the plaintiff's personal interest in the litigation "continue throughout its existence." *Laidlaw*, 528 U.S. at 189; *see also Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010) ("When a party with standing at the inception of the litigation loses it due to intervening events, the inquiry is really one of mootness.").

IDOC argues that events between April 2019 and January 2020 render Montoya's and Blaye's claims moot. Doc. 145 at 2-3. For Montoya, who was a plaintiff when this case was filed in March 2018, Doc. 1, developments in the April 2019–January 2020 window could possibly moot her claims. Blaye, by contrast, did not join the suit until late February 2020, Doc. 92, after the alleged jurisdiction-defeating events took place, so IDOC's argument in fact is that he lacks standing. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 49, 51 (1991) (where "[t]he second amended complaint named three additional plaintiffs," assessing standing for those plaintiffs "at the time the second amended complaint was filed").

## A.    Blaye

As noted, Blaye seeks both injunctive and declaratory relief against IDOC. "To assert [Article III] standing for injunctive relief, [a plaintiff] must show that [he is] under an actual or

imminent threat of suffering a concrete and particularized 'injury in fact'; that this injury is fairly traceable to the defendant's conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). "The plaintiff[] bear[s] the burden of establishing each of these elements." *Ibid*. A plaintiff has standing to seek declaratory relief if "the facts alleged … show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Simic v. City of Chicago*, 851 F.3d 734, 740 (7th Cir. 2017) (quotation marks omitted). As with injunctive relief, the "substantial controversy" required to demonstrate standing for declaratory relief requires "ongoing or impending harm." *Swanigan v. City of Chicago*, 881 F.3d 577, 583 n.2 (7th Cir. 2018). To obtain either form of relief, the alleged "threatened injury" must be "certainly impending" or there must at least be "a substantial risk that the harm will occur." *Id*. at 583 (quotation marks omitted).

Blaye has standing. Being deprived of a relationship with one's child surely is an injury-in-fact. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). IDOC currently permits Blaye to see his son, but a "substantial risk" remains that he could lose that access. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). The reason is plain: IDOC policy states that IDOC will "continually assess the safety plan and address any issues as long as visitation is permitted," with the possibility that "[v]isitation may be suspended" upon reassessment. Doc. 134-1 at 3.

12

The record shows, at least for standing purposes, that the potential grounds for suspension of visitation are unclear and fall short of new criminal conduct. Dixon testified that each containment team has "discretion to decide what criteria to use" when making child-access assessments, including "compliance with conditions of parole" and "the parolee's participation in therapy." Doc. 134-3 at 6. One therapist cited several factors the team may consider, including the parolee's "ability to self-regulate" and whether he has a "negative view of the process or the system," adding: "There's so many variables, I could talk for days about that." Doc. 134-4 at 4.

It is far from "conjectural" or "hypothetical" that Blaye could, in IDOC's view, run afoul of one of those various requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Many of the factors upon which IDOC relies in deciding whether to suspend parent-child visitation—including falling behind on therapy bills, Doc. 134-4 at 2—are far less serious than the crime of which Blaye was convicted. Finding a substantial risk of future injury to Blaye therefore does not depend on the disfavored assumptions that he will "repeat the type of misconduct" that deprived him of contact with his son in the first place, *Loertscher*, 893 F.3d at 395, or that he will "be prosecuted for violating valid criminal laws," *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1541 (2018) (quotation marks omitted).

If Blaye's permission for parent-child contact were revoked, IDOC policy provides that "reinstatement" would "require staffing with the containment team." Doc. 134-1 at 3. Although the exact meaning of this directive is obscure, it suggests that reinstatement may be more difficult than gaining permission in the first place, a process that itself can be lengthy. Blaye was fortunate in his first attempt, obtaining phone contact and then in-person contact with his son within weeks of his initial request. Doc. 129 at 13; Doc. 128-11 at 2. But as Velna's experience

shows, the process can take much longer if a member of the containment team has concerns about the parolee's level of engagement in therapy. Doc. 158-4 at 2; Doc. 152-2 at 1-7.

With a constitutionally sufficient risk of injury established, traceability and redressability are straightforward. To evaluate traceability and redressability, the court must assume that Plaintiffs are correct that the criteria set by IDOC policy for making child access determinations violate Blaye's due process rights. *See United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 818 (7th Cir. 2013) ("[T]o have standing, a claimant need not establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit.") (internal quotation omitted). Under that assumption, IDOC's policy clearly imperils Blaye's ability to have contact with his son, and suspending that policy would allow him to interact with his son freely. There accordingly was a "substantial controversy" between Blaye and IDOC when he joined this suit as a party plaintiff, which gives him standing. *Simic*, 851 F.3d at 740.

### B.     Montoya

Montoya had standing when she filed this suit in March 2018. At that time, she remained incarcerated but faced an immediate six-month ban on contact with her children upon her release to MSR. Doc. 1 at ¶¶ 80-81; 2019 WL 296556 at *1 (describing the previous six-month blanket policy). The question here is whether her case has since become moot.

Unlike Blaye, who has had only limited in-person contact with his child, Doc. 128-8 at ¶¶ 18-19, Montoya has been living in her family home with her children since August 2019, Doc. 128-1 at ¶ 17. In addition, an order from her sentencing court safeguards her ability to contact her children, putting her in a more secure position than Blaye. Doc. 128-4 at 2-3. That said, the court order guarantees only "contact" with her children, *ibid*., so IDOC in theory could require Montoya to move out of her home and restrict her to telephone contact without violating the order. But there is no indication that IDOC has any plans to do so.

Given all this, Montoya certainly faces a lower risk of injury than does Blaye. That said, mootness poses a lower hurdle for plaintiffs than does standing. Although mootness is often described as "the doctrine of standing set in a time frame," the Supreme Court has explained that this description "is not comprehensive." *Laidlaw*, 528 U.S. at 189-90. First, it is the defendant, not the plaintiff, who bears the burden of showing that a once-justiciable case has become moot. *See Killian v. Concert Health Plan*, 742 F.3d 651, 660 (7th Cir. 2013) ("[T]he burden of demonstrating mootness is a heavy one, borne by the party seeking to have the case declared moot.") (internal quotation marks and citation omitted); *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004) ("The party asserting mootness bears the burden of persuasion."); *Wilk v. AMA*, 895 F.2d 352, 367 (7th Cir. 1990) ("The mootness burden is a heavy one, and the *defendant* must show that there is no reasonable expectation that the wrong will be repeated.").

Second, "the 'time frame' conception does not account for some well-established exceptions to mootness." *Milwaukee Police Ass'n*, 708 F.3d at 929. One exception provides that, where the plaintiff seeks a declaratory judgment regarding "an ongoing [government] policy," the suit "may continue, even after the specific offense precipitating the suit has become moot." *Id*. at 930. That exception to the mootness doctrine originated in *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115 (1974), where a company's request for an injunction against the enforcement of state labor regulations became moot with the end of a strike. *Id*. at 121. But "even though the case for an injunction dissolved with the … settlement of the strike," the Supreme Court held that the parties "may still retain sufficient interests and injury as to justify the award of declaratory relief." *Id*. at 121-22. Specifically, the Court held, a district court retains jurisdiction to grant declaratory relief when "the challenged governmental activity … by its continuing and brooding presence, casts what may well be a substantial adverse effect on the

interests of the petitioning parties." *Id.* at 122; *see also Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 327-28 (2000) (holding that a claim for declaratory relief regarding electoral redistricting was not moot, despite the election having come and gone, because the existing plan would have probable continuing effect as a baseline for future redistricting plans); *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 860 (7th Cir. 2018) ("[A] request for a declaratory judgment may not be moot where a defendant's ongoing policy continues to affect the parties' relationship.").

Montoya's claim for declaratory relief presents a clear case for the *Super Tire* exception. The likelihood of IDOC prohibiting *any* contact with her children is doubtful given the court order. But the order does not restrain IDOC from *limiting* Montoya's contact with her children, such as requiring her to move out of the family home and restricting her to telephone calls, so the IDOC policy—with its open-ended criteria for reassessing danger—"is a factor lurking in the background" of Montoya's daily life on MSR. *Super Tire*, 416 U.S. at 124. According to IDOC, the purpose of MSR is "to allow the parolee an adjustment period and thereby increase the parolee's chances for successful reentry into society." Doc. 109 at 12. This "adjustment period," which for Montoya could last indefinitely, Doc. 128-4 at 2, casts a "continuing and brooding presence" over her relationship with her children. *Super Tire*, 416 U.S. at 122. That prevents her declaratory challenge to the IDOC policy from becoming moot.

It is less clear that Montoya's claim for injunctive relief remains a live controversy. "In an action seeking injunctive relief, the requirement of a live controversy ordinarily means that, once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot." *Loertscher*, 893 F.3d at 392-93 (internal quotation marks omitted). The court need not resolve this question, for Montoya may remain in this suit so long as she retains a live interest in at least one form of relief. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("[A] case becomes moot

only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.") (internal quotation marks omitted).  That said, the mootness challenge impairs Montoya's adequacy as a class representative, a subject the court will address in ruling on Plaintiffs' class certification motion.  *See Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) (holding that the plaintiff "did have standing to pursue this lawsuit," but explaining that "whether he may serve as an adequate class representative" is a "separate question[]").

## II.    Rule 12(b)(6) Dismissal as to Montoya and Blaye

In denying without prejudice IDOC's Rule 12(b)(6) motion as to Montoya and Blaye, the court stated that if their claims "are not moot, the court will resolve the merits of [IDOC's] Rule 12(b)(6) motion as to them."  2020 WL 4464672, at *3.  IDOC's arguments for dismissal advanced no grounds specific to Montoya or Blaye.  Doc. 109 at 5-17; Doc. 121 at 1-11. Accordingly, for the reasons given in denying dismissal of Molina's claims, 2020 WL 4464672, at *4-5, Montoya's and Blaye's claims survive dismissal under Rule 12(b)(6).

## III.    Class Certification

The court's analysis of class certification "is not free-form, but rather has been carefully scripted by the Federal Rules of Civil Procedure."  *Chi. Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 433 (7th Cir. 2015).  To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a); *see Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015).  The proposed class also must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards

17

for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011); *see also Bell*, 800 F.3d at 373. Finally, the class must be "identifiable as a class," meaning that the "class definition[] must be definite enough that the class can be ascertained." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see also Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659-61 (7th Cir. 2015).

"The plaintiff bears the burden of proving by a preponderance of the evidence all necessary prerequisites to the class action." *Priddy*, 870 F.3d at 660. The Seventh Circuit has instructed district courts to exercise "caution" before certifying a class. *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008). That caution demands a close look at each Rule 23 requirement.

### A.     Ascertainability

As noted, a class definition "must be definite enough that the class can be ascertained." *Oshana*, 472 F.3d at 513; *see also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495-97 (7th Cir. 2012); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7A *Federal Practice and Procedure* § 1760 (3d ed. 2020) ("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."). "Class definitions have failed this requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called 'fail-safe' classes)." *Mullins*, 795 F.3d at 657.

Ascertainability poses no obstacle here. Plaintiffs propose this class: "[A]ll parents of minor children who are on [MSR] for a sex offense under the supervision of [IDOC]." Doc. 93 at 1. Because this class definition sets forth "objective criteria" by which class members may be identified, the proposed class is ascertainable. *Mullins*, 795 F.3d at 659.

IDOC argues that the class definition is "overbroad" because it "could include many individuals who *have not* been harmed by IDOC's current policy." Doc. 128 at 6 (emphasis added). For instance, IDOC observes, the proposed class includes parolees who cannot have contact with their children because their children were their victims, and parolees who already have full contact with their children. *Ibid*. IDOC's argument is unpersuasive.

True enough, a class definition can be too broad if "it sweeps within it persons who *could not* have been injured by the defendant's conduct." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (emphasis added). Yet it is "almost inevitable" that a class will "include persons who *have not* been injured by the defendant's conduct," and "[s]uch a possibility or indeed inevitability does not preclude class certification." *Ibid*. (emphasis added); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 757 (7th Cir. 2014) ("If the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong."); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified."); *Messner*, 669 F.3d at 824 (explaining the "critical" distinction "for class certification purposes" between a proposed class that includes "members who are ultimately shown to have suffered no harm" and one that includes "members who for some reason could not have been harmed"). IDOC's argument is only that the putative class includes persons who "have not" been harmed by its policy, which is not a ground for finding a proposed class definition overbroad. Because it

19

would appear that all members of the proposed class could be injured by IDOC's policy, there is no overbreadth problem.

### B.    Rule 23(a)(1): Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although no magic number exists for satisfying the numerosity requirement, the Seventh Circuit has held that "[e]ven if the class were limited to 40 [members] … that is a sufficiently large group to satisfy Rule 23(a) where the individual members of the class are widely scattered and their holdings are generally too small to warrant undertaking individual actions." *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *see also Hayes v. Wal–Mart Stores, Inc.*, 725 F.3d 349, 356 n.5 (3d Cir. 2013) ("While no minimum number of plaintiffs is required to maintain a suit as a class action … generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.") (internal quotation marks omitted). A plaintiff need not plead or prove the exact number of class members to establish numerosity, *see Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1987) ("[P]laintiffs are not required to specify the exact number of persons in the class."); *Vergara v. Hampton*, 581 F.2d 1281, 1284 (7th Cir. 1978) ("[D]ifficulty in determining the exact number of class members does not preclude class certification."), and the court may make commonsense assumptions in the Rule 23(a)(1) inquiry, *see Arreola*, 546 F.3d at 797 (finding numerosity after the plaintiff identified fourteen class members and adduced evidence that "support[ed] a much larger estimate"); 1 William Rubenstein et al., *Newberg on Class Actions* § 3:13 (5th ed. 2020) ("Generally, a plaintiff must show enough evidence of the class's size to enable the court to make commonsense assumptions regarding the number of putative class members.").

IDOC attests in an interrogatory response that "approximately 550 parolees are currently under the supervision of the [IDOC] Sex Offender Supervision Unit." Doc. 93-1 at ¶ 1. According to the Census Bureau, just over 40 percent of American households had minor children in 2019. *See* U.S. Census Bureau, America's Families and Living Arrangements tbl. F1 (2019), https://www.census.gov/data/tables/2019/demo/families/cps-2019.html (reflecting that approximately 34 million families out of 83 million have minor children); *see also United States v. United Bhd. of Carpenters & Joiners of Am., Local 169*, 457 F.2d 210, 214 n.7 (7th Cir. 1972) (holding that courts may take judicial notice of U.S. Census Bureau reports). Under the commonsense assumption that parolees are about as likely as adults generally to have minor children, the potential number of class members easily exceeds 40. In addition, Plaintiffs have compiled a list of 45 members of the putative class. Doc. 134-2. IDOC contests the membership status of several of those individuals, Doc. 146 at 2-3, but given the Census Bureau statistics, Plaintiffs' list was almost certainly underinclusive as well. Numerosity poses no obstacle to class certification.

### C.    Rule 23(a)(2): Commonality

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" and that their claims "depend upon a common contention … of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (internal quotation marks omitted). "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Id*. at 359 (alterations and internal quotation marks omitted); *see also Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 551 (7th Cir. 2016) ("[A] prospective class must articulate at least one common question that will actually advance all of the class members' claims."). Plaintiffs assert four common

questions they argue are appropriate for classwide resolution: (1) whether the criteria IDOC uses to evaluate parent-child contact requests violate due process, Doc. 134 at 8-10; (2) whether IDOC's use of those criteria causes unreasonable delays in reaching decisions as to parent-child contact in violation of due process, *id*. at 10-13; (3) whether IDOC provides for decisionmakers sufficiently neutral to satisfy due process, *id*. at 13-14; and (4) whether IDOC's presumptive 35-day ban on contact after release to MSR violates due process, *id*. at 15-16.

Before proceeding to analyze these four questions, the court addresses IDOC's contention that no common questions can exist because its decisions on individual parent-child contact requests depend on circumstances specific to each parent-parolee. Doc. 128 at 10-12; Doc. 146 at 4-5. IDOC is correct that whether particular parents are allowed to contact their children do not pose common questions. *See Jamie S.*, 668 F.3d at 497 ("[P]laintiffs must show that they share some question of law or fact that can be answered *all at once* and that the *single answer* to that question will resolve a central issue in all class members' claims."). But Plaintiffs' proposed common questions, at least on their face, do not require such individualized findings because they instead probe the legality of the generally applicable aspects of IDOC's parent-child contact policy. *See id*. at 498 (explaining that "an illegal *policy* might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class"). The fact that parolees experience the allegedly unlawful policies in potentially different ways does not preclude commonality. *See Orr v. Shicker*, 953 F.3d 490, 499 (7th Cir. 2020) (holding that an Eighth Amendment challenge to Hepatitis C treatment in IDOC facilities presented a common question because, "[a]lthough the physical symptoms and progression suffered by each inmate undoubtedly vary, there is still a general question that can yield a common answer").

Pressing the contrary result, IDOC argues that *Phillips v. Sheriff of Cook County*, *supra*, held that a proposed class representative can satisfy commonality only by showing that the challenged policy "harms each class member in essentially the same way." Doc. 146 at 4. *Phillips* involved a constitutional challenge regarding dental care at Cook County Jail. 828 F.3d at 544. The plaintiffs in *Phillips* asserted that two questions were common to their claims, both involving policies that allegedly caused treatment delays and gratuitous pain. *Id*. at 555. After examining precedent governing delays in providing medical treatment, the Seventh Circuit held that the fact of delay alone "does not advance materially any individual's claim of deliberate indifference." *Id*. at 556. The reason, the Seventh Circuit explained, is that "the constitutionality of a wait for medical treatment will depend on a variety of individual circumstances." *Id*. at 555-56 (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)); *see also McGowan*, 612 F.3d at 640 ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment."). The result in *Phillips* thus turned on the highly individualized nature of medical delay claims. Here, by contrast, Plaintiffs allege due process violations arising from "systemic practice[s]," 828 F.3d at 558, the legality of which could present common questions.

Turning to the proposed common questions, Plaintiffs do not specify whether each question pertains to substantive due process, procedural due process, or both. The distinction between the two due process theories is important. "The substantive component of the Due Process Clause 'bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them.'" *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 368 (7th Cir. 2019) (quoting *Porter v. DiBlasio*, 93 F.3d 301, 310 (7th Cir. 1996)). By contrast, for a procedural due process violation, "the deprivation by state action of a

constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1020 (7th Cir. 2000) (quoting *Doe ex rel. Nelson v. Milwaukee Cnty.*, 903 F.2d 499, 502 (7th Cir. 1990)). Although the same government act can give rise to both kinds of claims, *see id.* at 1020 n.16, there is no such thing as a generic due process claim, so the court will pay heed to the separate due process theories in considering Plaintiffs' asserted common questions.

### 1. 35-Day Presumptive Ban on Parent-Child Contact

One potentially common question posed by Plaintiffs is whether IDOC's presumptive 35-day ban on parent-child contact after release to MSR violates due process. As an initial matter, IDOC disputes that its policy deprives parolees of child access for 35 days after release. Despite Dixon's testimony that parolees generally may not contact their children immediately upon release, Doc. 134-3 at 2, IDOC contends that 35 days is the *maximum* time that it could take to reach an initial determination, which necessarily means that some decisions could be rendered more quickly, Doc. 146 at 11. Whether the prohibition lasts at least or at most 35 days, however, there is no question that IDOC's policy *permits* it to withhold contact for 35 days before it must grant or deny parent-child contact. Doc. 134-1 at 2. Plaintiffs have thus shown, at least for Rule 23(a)(2) purposes, that its policy allows a practical 35-day ban on such contact.

The 35-day ban poses questions common to the class as a whole. The gravamen of the claim is that the 35-day ban applies uniformly and indiscriminately and thus does not account for individual situations. Doc. 134 at 15-16. This alleged deficiency raises issues of both procedural and substantive due process that can be resolved on a classwide basis.

"The fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation omitted); *see also Brokaw*, 235 F.3d at 1021 ("[D]ue process guarantees that the post-deprivation judicial review of a child's removal be prompt and fair."). Earlier in the litigation, the court enjoined on procedural due process grounds IDOC's previous categorical six-month ban because Plaintiffs were likely to succeed in arguing that six months is too long to delay a post-deprivation hearing. Docs. 32-33. The shorter 35-day delay is of course more likely to pass procedural due process muster, but either way the answer to that question will apply equally to all class members.

The 35-day ban also raises a common substantive due process question. Plaintiffs argue that the ban is not "narrowly tailored" because it applies equally to phone, written, and in-person parent-child contact. Doc. 134 at 15. An impairment of "the interest of parents in the care, custody, and control of their children" is subject to heightened scrutiny because it impinges on a "fundamental" right. *Troxel*, 530 U.S. at 65. Regardless of whether the deferential *Turner v. Safley*, 482 U.S. 78 (1987), standard governs Plaintiffs' claims, a substantive due process challenge to the 35-day ban would succeed or fail as to the class in its entirety.

### 2. Parent-Child Contact Criteria

Another question posed by Plaintiffs—the legality of the criteria IDOC uses to grant or deny parent-child contact, Doc. 134 at 8-10—also presents a common question of substantive due process law. Plaintiffs have a substantive due process "right to family integrity," which requires that "a balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse." *Brokaw*, 235 F.3d at 1019. This balance demands that, before impairing the parent-child relationship, the State must have "some definite

and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Ibid.*; *see also Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 928 (7th Cir. 2011) (same). Plaintiffs argue that five criteria IDOC employs as part of its current policy have no connection any risk of child abuse: (1) not having taken a polygraph, (2) insufficient duration of therapy; (3) the parolee's denial of guilt; (4) noncompliance with conditions of parole; and (5) unreliable attendance at therapy. Doc. 134 at 9. Every parent-parolee seeking parent-child contact is subject to those criteria. This litigation can resolve, as a general matter, whether those criteria are pertinent to whether there is "a reasonable suspicion that a child has been abused or is in imminent danger of abuse," *Brokaw*, 235 F.3d at 1019, and thus whether the criteria are permissible under the governing due process standard.

### 3.     Reasonable Time Frame for Decision

Another question posed by Plaintiffs is whether the IDOC policy's criteria "endorse[] long delays as a matter of course." Doc. 134 at 11. Specifically, Plaintiffs argue that the "insufficient therapy" criterion and the polygraph requirement "lead to lengthy disruptions in parent-child relationships for parolees of limited means" while IDOC reaches a decision on parent-child contact. *Id.* at 11-12. A claim that a state actor's procedures take too long sounds in procedural, not substantive, due process. *See Berman v. Young*, 291 F.3d 976, 984-85 (7th Cir. 2002) (assessing a delayed hearing claim in a child removal case under procedural due process precedents); *cf. Morrissey v. Brewer*, 408 U.S. 471, 488 (1972) (holding, as a matter of procedural due process, that parole revocation hearing must occur "within a reasonable time" after a parolee's return to custody).

IDOC submits, convincingly, that Plaintiffs are challenging not a systematic practice of delays in making decisions, but rather repeated, specific denials of access to parolees' children.

Doc. 146 at 8. IDOC reassesses the availability of parent-child contact and issues a new written decision every 28 days. Doc. 134-1 at 3. Plaintiffs do not argue that this 28-day timeline is itself unreasonably long or present evidence that IDOC is failing to make the reassessments. Instead, Plaintiffs complain of ongoing denials for allegedly improper reasons. Doc. 134 at 10. Those individual denials, and the "delays" they cause, do not pose a common question across the class as a whole. The legality of each denial and resulting delay turns on "the unique facts of each [parolee's] case," and thus is "incapable of being solved on a classwide basis." *Phillips*, 828 F.3d at 556.

Moreover, a procedural due process claim cannot be premised on an unfavorable result, or even a series of unfavorable results. *See Simmons v. Gillespie*, 712 F.3d 1041, 1044 (7th Cir. 2013) ("[T]he federal entitlement is to process, not to a favorable outcome."); *Marozsan v. United States*, 90 F.3d 1284, 1289 (7th Cir. 1996) ("[T]he Due Process Clause is not a guarantee against incorrect results … ."). The fact that the therapy and polygraph requirements cause long delays in allowing parent-child contact could bolster Plaintiffs' *substantive* due process challenge to those criteria insofar as the delays increase the burden on their fundamental right to familial relations. *See Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003) ("[W]hen analyzing a familial relations claim, a 'balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse … .'") (quoting *Brokaw*, 235 F.3d at 1019); *see also Troxel*, 530 U.S. at 68 (holding, based on a "combination of several factors," that a state visitation statute, as applied, unconstitutionally infringed parents' fundamental right to rear their children). But repeated denials and the resulting delays do not raise a procedural due process question common to the class as a whole.

### 4. Lack of a Neutral Decisionmaker

Another potentially common question posed by Plaintiffs is whether the IDOC policy provides for review by a sufficiently neutral decisionmaker. Doc. 134 at 13-14. This claim sounds in procedural due process. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (holding that procedural due process requires "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker"); *Morrissey*, 408 U.S. at 489 (holding that procedural due process requires that parole revocation decisions be made by a "neutral and detached" hearing body); *Felce v. Fiedler*, 974 F.2d 1484, 1498 (7th Cir. 1992) (holding that the procedure for imposing mandatory drug injections on a parolee "was insufficiently neutral and independent" to satisfy due process). Plaintiffs observe that all decisions about parent-child contact are made by "IDOC employees … and individuals who are directly involved in the supervision and treatment of Plaintiffs." Doc. 134 at 14. And when parolees appeal denials of their requests for child access, the appeals are resolved by IDOC employees: Dixon and Brown-Foiles. Doc. 134-1 at 3; Doc. 134-3 at 4; Doc. 158-2 at 28-29.

IDOC incorrectly argues that Plaintiffs must show how the lack of a neutral decisionmaker has harmed them in order to certify this question for class treatment. Doc. 146 at 9. Granted, Plaintiffs can prevail on the merits of this question only if they demonstrate "the probable value … of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Moreover, the decisionmakers' status as IDOC employees, without more, may be insufficient in itself to establish a due process violation. *See Felce*, 974 F.2d at 1499 ("[A] decisionmaker need not be external to an institution to be independent … ."). But whatever the merits of Plaintiffs' claim on the neutrality question, the question it poses is common, as every putative class member must seek approval from the same set of decisionmakers. That is enough to show that the

question is susceptible to classwide resolution. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

### D. Rule 23(a)(3): Typicality

The Rule 23(a)(3) typicality requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993). Typicality is satisfied when the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (alterations and internal quotation marks omitted). Typicality "should be determined with reference to the [defendant's] actions, not with respect to particularized defenses it might have against certain class members." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011).

Typicality closely parallels commonality under the facts and circumstances of this case. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("The question of typicality in Rule 23(a)(3) is closely related to the … question of commonality."). IDOC again argues that Plaintiffs "have had widely varying interactions" with IDOC and present "varying circumstances inherent in their requests for child contact." Doc. 128 at 14. That argument fails to defeat typicality for the same reasons it fails to defeat commonality: Plaintiffs do not seek to establish through this lawsuit whether they, as individuals, may contact their children. Rather, they seek to challenge the aspects of the IDOC's parent-child contact policy identified as classwide questions above.

29

### E.    Rule 23(a)(4): Adequacy

Adequacy involves two inquiries: "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). A proposed class representative is inadequate if her interests are "antagonistic or conflicting" with those of absent class members, *Rosario*, 963 F.2d at 1018, or if she is subject to a defense not applicable to the class as a whole, *see CE Design*, 637 F.3d at 726; *Randall v. Rolls–Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011); *Hardy v. City Optical Inc.*, 39 F.3d 765, 770 (7th Cir. 1994); *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1164-65 (7th Cir. 1974). Likewise, "[a] person whose claim is idiosyncratic or possibly unique is an unsuitable class representative." *Suchanek*, 764 F.3d at 758 (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156-59 (1982)).

IDOC argues that Molina is an inadequate class representative because he is subject to the unique defense that he has not taken a polygraph examination. Doc. 128 at 15. IDOC's factual premise is correct, as the specific stumbling block for Molina has been his inability to afford a polygraph examination. (IDOC asserts that he is "unwilling[]" to take the exam, *ibid*., but adduces no evidence to contradict Molina's sworn statements that he does not have $300 to $350 to cover that expense. Doc. 128-5 at ¶¶ 7, 9.) But Molina's inability to afford a polygraph examination does not raise a defense to liability; rather, it is the particular way in which he has been injured by IDOC's allegedly unconstitutional policies. As noted, Plaintiffs allege that the polygraph requirement violates their substantive due process rights because it has no connection to child endangerment. Doc. 134 at 9. The fact that this claim has a specific manifestation for Molina bolsters, not undermines, his adequacy as a class representative because it shows that he "possess[es] the same interest and suffer[ed] the same injury as the class members." *Conrad v.*

*Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997)); *see also Orr*, 953 F.3d at 499 (same).

IDOC also argues that Montoya and Blaye are inadequate because their claims are moot. Doc. 128 at 14-15. As shown above, Blaye has standing to pursue both declaratory and injunctive relief, so IDOC's argument fails as to him.

IDOC is correct, however, that the mootness questions render Montoya an inadequate class representative. Although Montoya retains a live claim for declaratory relief, her claim for injunctive relief may be partially moot because of the court order that safeguards her contact with her children. The court order is unique to her, as neither party presents evidence of another parent having obtained similar protection. The Seventh Circuit has cautioned that "even an *arguable* defense peculiar to the named plaintiff … bring[s] into question the adequacy of the named plaintiff's representation." *CE Design*, 637 F.3d at 726 (emphasis added). The Seventh Circuit confronted a similar situation in *Arreola*, where the named representative for a putative class of jail inmates had been released. 546 F.3d at 793. The court held that although the plaintiff had standing as a jurisdictional matter, *id.* at 795, he was not an adequate class representative because "his interest in prospective relief [was] too tenuous," *id.* at 799. Similarly, here, Montoya no longer "possess[es] the same interest" as other class members in injunctive relief. *Conrad*, 869 F.3d at 539. She therefore cannot serve as a class representative.

Montoya's situation does not impede class certification, however, because Molina and Blaye adequately represent the class on their own. *See Nielsen v. Preap*, 139 S. Ct. 954, 963 (2019) (holding that dismissal of a class action on mootness grounds was inappropriate because "there was at least one named plaintiff with a live claim when the class was certified"); Wright, Miller & Kane, *supra*, § 1765 ("[I]f there is more than one named representative, it is not

necessary that all the representatives meet the Rule 23(a)(4) standard; as long as one of the representatives is adequate, the requirement will be met.").

Class counsel are adequate in that they are experienced in class actions in general and 42 U.S.C. § 1983 suits in particular. Doc. 93 at 8-9.

### F.      Rule 23(b)(2)

Plaintiffs move to certify a class under Rule 23(b)(2), Doc. 93 at 2, which provides that class certification is available if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Subsumed in this rule are at least two independent requirements: The contemplated equitable relief must be (1) 'appropriate respecting the class as a whole' and (2) 'final.'" *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011).

As IDOC implicitly concedes by making no argument on the point, the putative class meets both requirements. Plaintiffs do not seek monetary relief; rather, they seek a declaration that the IDOC's current parent-child contact policy violates due process and an injunction that would prohibit IDOC from continuing the allegedly unconstitutional aspects of that policy. Doc. 92 at ¶¶ 86, 88. Moreover, as shown above, Plaintiffs have demonstrated that those aspects of the policy present questions common to the class as a whole. Molina and Blaye have live claims for injunctive and declaratory relief. Such relief would prevent Plaintiffs' threatened injuries and finally resolve their claims against IDOC. The class is appropriate for certification under Rule 23(b)(2).

### Conclusion

Plaintiffs' class certification motion is granted in part. "An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class

counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B); *see Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015) ("[T]he obligation to define the class falls on the [district] judge's shoulders under [Rule 23(c)(1)(B)]."). The class is defined as all parents of minor children who are on MSR for a sex offense under IDOC supervision. The claims to be tried are: (1) whether the IDOC policy's presumptive 35-day ban on parent-child contact violates procedural due process; (2) whether the presumptive 35-day ban violates substantive due process; (3) whether certain criteria IDOC uses to make parent-child contact determinations violate substantive due process; and (4) whether the lack of a neutral decisionmaker violates procedural due process. Molina and Blaye are the class representatives. Pursuant to Rule 23(g), Adele D. Nicholas and Mark G. Weinberg are appointed as class counsel.

November 10, 2020

_____
United States District Judge