UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CELINA MONTOYA, ZACHARY BLAYE, and RONALD MOLINA, individually and on behalf of all others similarly situated, | ) ) ) | 18 C 1991 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| ROB JEFFREYS, in his official capacity as Director of the Illinois Department of Corrections, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Celina Montoya, Zachary Blaye, and Ronald Molina, all serving mandatory supervised

release ("MSR") terms following imprisonment for Illinois sex offense convictions, bring this

certified class action under 42 U.S.C. § 1983 against Rob Jeffreys in his official capacity as

Director of the Illinois Department of Corrections ("IDOC"), alleging that IDOC's

implementation of an MSR condition prohibiting them from having contact with their minor

children without prior approval violates their Fourteenth Amendment due process rights.

Doc. 92. Earlier in the litigation, the court enjoined enforcement of IDOC's then-current

parent-child contact policy, Doc. 33, and denied IDOC's motion to dismiss Plaintiffs'

substantive due process claim, Docs. 63-64 (reported at 2019 WL 296556 (N.D. Ill. Jan. 23,

2019)). Plaintiffs then filed an amended complaint directed against IDOC's current policy.

Doc. 92. The court denied IDOC's motion to dismiss the amended complaint, Docs. 138-139

(reported at 2020 WL 4464672 (N.D. Ill. Aug. 4, 2020)), and granted Plaintiffs' motion to certify

a class under Civil Rule 23(b)(2) to seek injunctive relief against certain aspects of the current

policy. Docs. 165-166 (reported at 2020 WL 6581648 (N.D. Ill. Nov. 10, 2020)).

Plaintiffs and IDOC now cross-move for summary judgment on all claims. Docs. 171, 192. Plaintiffs' motion is denied, and IDOC's motion is granted in part and denied in part.

## Background

Because the parties cross-move for summary judgment, the court must consider the facts in the light most favorable to Plaintiffs when addressing IDOC's motion and in the light most favorable to IDOC when addressing Plaintiffs' motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). To the extent a disputed fact relates to both sides' motions, the court will set forth the parties' respective positions. At this juncture, the court does not vouch for either side's version of the facts. *See Gates v. Bd. of Educ.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A. The No-Contact Condition

The class is defined as "all parents of minor children who are on [MSR] for a sex offense under the supervision of [IDOC]." Doc. 165. IDOC is responsible for monitoring persons on MSR—who for ease of reference will be called "parolees"—convicted of sex offenses. Doc. 205 at ¶ 1. IDOC supervises approximately 1,600 parolees who were convicted of sex offenses, most with victims under the age of 18. *Id*. at ¶ 2; Doc. 195-1 at ¶ 3.

Although IDOC manages the supervision of parolees, the MSR statute grants the Illinois Prisoner Review Board ("IPRB") the power to set MSR conditions: "The conditions of … [MSR] shall be such as [IPRB] deems necessary to assist the subject in leading a law-abiding life." 730 ILCS 5/3-3-7(a). The statute lists a series of conditions that IPRB *must* impose, such as not violating any criminal statute, *id*. at § 5/3-3-7(a)(1); reporting to an IDOC parole agent, *id*. at § 5/3-3-7(a)(3); and—for parolees "convicted of a sex offense"—completing sex offender

2

treatment, *id*. at § 5/3-3-7(a)(7.5).  Another required condition is that a parolee must "follow any specific instructions provided by the parole agent that are consistent with further conditions set and approved by [IPRB] or by law."  *Id*. at § 5/3-3-7(a)(15).  IDOC has over forty parole agents and four parole commanders assigned to supervise sex offenders.  Doc. 205 at ¶ 3.

The MSR statute further provides that "persons required to register as sex offenders … *may* be required by [IPRB] to comply with" several additional conditions.  730 ILCS 5/3-3-7(b-1) (emphasis added).  One such condition is to "refrain from all contact, directly or indirectly, personally, by telephone, letter, or through a third party, with minor children without prior identification and approval of an agent of [IDOC]."  *Id*. § 5/3-3-7(b-1)(9).  Plaintiffs submit that IPRB imposes on all parolees with sex offense convictions a condition that tracks that statutory language.  Doc. 171 at 11.  IDOC states that "almost all sex offenders" must abide by the condition to not contact minor children without prior IDOC approval.  Doc. 192-1 at 15.  IDOC does not elaborate as to which offenders might be exempt from the requirement and does not contend that any such exceptions affect this case.

Due to this prohibition on contact with minor children, a parolee who committed a sex offense may not contact his or her *own* minor children upon release from prison.  Doc. 193 at ¶¶ 13-14.  The parties dispute whether this imposes a "presumptive ban" on child contact, Doc. 171 at 15; Doc. 192-1 at 6, but the debate is semantic.  IDOC states that it "has adopted a process for approving a paroled sex offender's request for contact with his or her minor children," which necessarily implies that approval is required and therefore that a presumptive ban is in place.  Doc. 192-1 at 16.  Indeed, IDOC Deputy Chief of Parole Dion Dixon testified that "[i]mmediately" upon release, "the presumption is that [the parolee] may not have contact with his or her children."  Doc. 174-2 at 3 (6:3-6), 9 (31:15-18).  By way of qualification, Dixon

added that "some parolees have come out with court orders stating that they can have contact with their children." *Id*. at 9 (31:20-23). But Dixon could not identify any other circumstances in which immediate child contact would be allowed. *Id*. at 9 (32:8-15). So, while IDOC resists characterizing its parolee-child contact policy as establishing a "presumption," the evidence shows that, absent a court order, IDOC does not allow parolees with sex offense convictions to contact their children upon their release on MSR. The court will refer to this policy as the "no-contact condition."

## B. Evaluations Conducted Before Release

IDOC's enabling statute provides that, before a person convicted of a sex offense is released from prison, he or she "shall be required to receive a sex offender evaluation." 730 ILCS 5/3-6-2(j). Sarah Brown-Foiles—IDOC's coordinator for sex offender services, Doc. 195-1 at ¶ 1—testified that IDOC conducts this evaluation about a year before the offender's scheduled release from prison. Doc. 174-7 at 23 (86:19-87:2). This "pre-release evaluation" is conducted by licensed sex offender evaluators. Doc. 193 at ¶ 59. The evaluation is a solely an "informative report" and "does not look to predict futur[e] risk" of re-offense. Doc. 174-7 at 24 (91:11-13). The evaluation does summarize the offender's background, educational attainment, medical needs, psychiatric and mental health history, and criminal history. *Id*. at 24 (92:21-93:15); Doc. 193 at ¶ 60. That information is derived from the prisoner's voluntary self-reporting, IDOC's internal records, and other sources such as case files and police reports. Doc. 174-7 at 24-25 (93:24-96:15). Pre-release evaluations are used to inform IDOC parole agents and treatment providers about "what type of client they're getting" upon an offender's release on MSR. Doc. 193 at ¶ 62.

Separately, the Sexually Violent Persons Commitment Act ("SVPCA"), 725 ILCS 207/1 *et seq*., creates a process by which the Attorney General of Illinois or the relevant county's

State's Attorney may petition for civil commitment of certain sex offenders upon their release

from prison. To facilitate this process, the SVPCA requires IDOC to conduct a "comprehensive

evaluation of the person's mental condition," which is different from the pre-release evaluation

discussed above. *Id*. at § 207/10(c)(2). Persons convicted of a "sexually violent offense" as

defined in the SVPCA, *id*. at § 207/5(e), must undergo this additional "SVP screening."

Doc. 193 at ¶ 64. All sex offenders in IDOC custody except those convicted of criminal sexual

abuse qualify for this SVP screening. *Ibid*. The SVP screening occurs approximately six months

before release and is informed by the earlier pre-release evaluation. *Id*. at ¶¶ 62, 64. The SVP

screening employs "actuarial-based risk assessment tools." *Id*. at ¶ 65.

IDOC does not use pre-release evaluations or SVP screenings to make any

determinations about child contact before sex offenders with children are released on MSR. As

noted, the no-contact condition initially prohibits contact absent a court order. Doc. 193 at

¶¶ 13-14. IDOC encourages parole agents to review the pre-release evaluation to "inform

decisions regarding restrictions," but that review happens after an offender's release. *Id*. at ¶ 63.

The parties dispute whether IDOC could practically use pre-release evaluations and SVP

screenings to make decisions before an inmate's release about whether the inmate should be

allowed to contact their children after release. Plaintiffs contend that a pre-release evaluation,

because it examines the inmate's criminal record, would at least reveal whether the inmate's

child was a victim of his or her crimes. Doc. 171 at 47. And pointing out that Blaye was granted

contact with his children after only one meeting with a therapist, Doc. 193 at ¶ 67, Plaintiffs

argue that a short evaluation period is sufficient to allow child contact for at least some

offenders, Doc. 171 at 70. IDOC counters that two other therapists stated that they would not be

comfortable making a recommendation about child contact based on the pre-release evaluation. Doc. 205 at ¶¶ 42, 51-52. So the predictive value of the pre-release evaluation is disputed.

Plaintiffs also contend that the SVP screening's risk assessment resembles "specialized evaluations" used in child custody and parental rights proceedings that can quickly render decisions about child contact. Doc. 193 at ¶¶ 65-66. IDOC responds that those "specialized evaluations" are "very expensive." *Id*. at ¶ 66; Doc. 205 at ¶ 112. To support their respective views, both sides rely exclusively on Brown-Foiles's brief testimony that there are "specific risk evaluation[s] with a specific goal" that "do exist in the field," but that they are "very ex[p]ensive." Doc. 174-7 at 34 (130:4-6). The record contains little detail about what Brown-Foiles was referring to, how these specialized evaluations compare to the SVP screening, or the feasibility of implementing them to make child contact determinations.

## C.     Parent-Child Contact Policy After Release on MSR

IDOC implements the no-contact condition through a written policy for assessing parolees' requests for child contact. Doc. 205 at ¶ 7. The policy mirrors the preliminary injunction order issued earlier in this case. *Id*. at ¶ 6; Doc. 33.

Upon release, all parolees convicted of a sex offense receive an information packet that explains the policy and the process for requesting contact with their minor children. Doc. 205 at ¶ 8. The policy provides that a parolee "shall be given the opportunity for an appointment with a sex offender therapist within 14 days of release." Doc. 174-1 at 1 (emphasis deleted). IDOC directly employs only four sex offender therapists, so most of the therapists are third-party providers. Doc. 205 at ¶ 22. Practically speaking, this means that parolees do not necessarily obtain an appointment with a sex offender therapist within 14 days of release, Doc. 193 at ¶ 37, but IDOC at least provides a referral to sex offender treatment within 72 hours of release, Doc. 205 at ¶ 14.

The process for obtaining permission for child contact begins only when a parolee requests such contact. *Id*. at ¶ 7; Doc. 174-2 at 10 (36:3-19). The policy provides that "[i]f a parolee has requested contact with biological children, within 21 days of the initial [therapy] appointment, the therapist and the parolee's parole agent will determine whether there is reasonable cause to believe that the parolee's child(ren) would be endangered by parent-child contact." Doc. 174-1 at 1 (emphasis deleted). The policy thus assumes that the parolee requested contact *before* the initial therapy appointment. It is unclear what timeline IDOC follows when a parolee requests contact *after* the initial appointment.

For a parolee who immediately requests parent-child contact upon release, the policy allows IDOC at least 35 days in which to make a determination whether contact would endanger the minor child: at least 14 days to see a therapist, and at least 21 days after that initial appointment. IDOC asserts that its policy "sets no 35-day period where parent-child contact cannot be approved." Doc. 205 at ¶ 19. Plaintiffs do not dispute that assertion, because it is true that "the written policy does not categorically prohibit approval of contact" in the initial 35-day window. *Ibid*. IDOC can, if it chooses, move faster. But there can be no dispute, simply from reading the policy's text, that it *allows* a delay of up to 35 days.

The parolee's "containment team" decides whether a parolee may have contact with his or her minor children. *Id*. at ¶ 9. The containment team comprises the parolee's parole agent, parole commander, sex offender therapist, and any other therapists treating the parolee. *Ibid*. The containment team may also include supervising parole officers, polygraph examiners, and victim advocates. Doc. 193 at ¶ 4. If parent-child contact is restricted or denied, the parolee must be provided written reasons, and the restriction or prohibition must be reviewed every 28 days. Doc. 205 at ¶ 16; Doc. 174-1 at 1-2. IDOC has a "Parolee/Releasee Determination of

Request for Contact with Child(ren)" form for rendering such decisions. Doc. 174-1 at 3. The form is included in the information packet that parolees receive upon their release. Doc. 205 at ¶ 8.

A "safety plan" jointly developed by the containment team and the parolee must also be in place before parent-child contact occurs. Doc. 174-1 at 1; Doc. 174-2 at 29 (110:6-11). A form safety plan is included in the informational packet, but it applies only to in-person visits. Doc. 174-1 at 5-7; Doc. 174-2 at 29 (110:16-20); Doc. 193 at ¶ 10. A safety plan for contact over the phone or by mail does not follow the same form, but the containment team may implement such a plan. Doc. 174-2 at 29 (110:16-24).

A parolee may seek review of an adverse decision "from the Deputy Chief of Parole" (currently Dixon) "or his/her designee" (currently Brown-Foiles), who must "respond in writing within 21 days." Doc. 174-1 at 2. IDOC has a form for such appeals. *Id*. at 4. The form asks the parolee for a statement "in rebuttal to the denial of your request for contact," and has a space for the "Reviewer's Determination." *Ibid*. Appeals are heard only by Dixon or Brown-Foiles, and no further appeal is allowed. Doc. 193 at ¶ 44; Doc. 174-1 at 2.

### D.     Criteria Used to Evaluate Child Contact Requests

The containment team may consider a wide range of criteria in evaluating child contact requests, Doc. 205 at ¶ 12, but only a few are relevant for present purposes. One of the certified questions for class resolution is whether five criteria used by IDOC violate substantive due process: (1) a parolee's not having taken a polygraph, (2) insufficient duration of therapy; (3) denial of guilt; (4) a parolee's noncompliance with MSR conditions; and (5) a parolee's unreliable attendance at therapy. 2020 WL 6581648, at *12.

IDOC directs the containment team to consider those five factors. The form that IDOC uses to respond to child contact requests lists eleven specific reasons for a denial, plus a twelfth

labeled "[o]ther" with space for explanation. Doc. 174-1 at 3. The eleven specific reasons include "[t]herapist requested polygraph but results are not available," "[i]nsufficient therapy sessions to make an assessment," and "[s]afety plan incomplete or not completed." *Ibid*. The form safety plan requires the parolee's initialed agreement to several additional requirements, essentially incorporating them as conditions for child contact. *Id*. at 5. Those additional requirements include "engag[ing] in Sex Offender Counseling services and [being] compliant with these services," and "successfully complet[ing] and pass[ing] a sexual history OR maintenance polygraph." *Ibid*. The form safety plan requires an approved chaperone for in-person child visits, and states that the chaperone "shall not … enable the offender to deny or refute any details of his/her conviction." *Ibid*. Finally, the containment team may consider "whether the parolee is progressing in therapy" and "whether the parolee has been compliant with the terms of his or her parole." Doc. 205 at ¶ 12.

Plaintiffs assert that the polygraph and therapy criteria can cause indefinitely long delays in approving child contact. As for the polygraphs, IDOC imposes no limit on how long a containment team can withhold approval for child contact based on the lack of a polygraph exam. Doc. 193 at ¶¶ 31-32. Deputy Chief Dixon testified that parolees are responsible for paying for their own polygraph exams, which typically cost between $200 and $400. *Id*. at ¶ 46. IDOC has no policy or practice to accommodate parolees who cannot pay for an exam. *Id*. at ¶ 48. The requirement that a parolee reliably attend therapy for a sufficient period also can create indefinite delays in the approval of parent-child contact. IDOC imposes no limit on how long a therapist can take to make a recommendation on whether to allow child contact. *Id*. at ¶ 30. Dixon testified that parolees are responsible for paying for weekly therapy, *id*. at ¶ 46, though some evidence suggests that certain therapists will accommodate parolees unable to pay,

*id*. at ¶ 132; Doc. 205 at ¶ 75. But IDOC has no policy to accommodate such parolees. Doc. 193 at ¶ 48.

Several therapists testified about the utility of polygraphs and their importance to sex offender therapy. Licensed clinical sex offender therapist Dr. Eleanor Harris explained that "the polygraph provides good information, such as letting her know whether the person is telling the truth or has been truthful about his interaction with children or prior victims." Doc. 205 at ¶ 44; *see also id*. at ¶¶ 86-88. Clinical psychologist Dr. Gerald Blain testified that a parolee's passing at least one polygraph is an "absolute requirement before [he] would make a recommendation about contact with a child." Doc. 174-4 at 16 (58:8-12). He explained that the mandatory polygraph "gets [patients] to disclose and open up and talk about" their sexual and offense history. *Id*. at 19 (70:4-5). Licensed sex offender therapist Michael Kleppin likewise requires a polygraph to "establish[] a baseline of offending behavior for therapeutic purposes and to rule-out, to the best of ability, no interfamilial [*sic*] offending has occurred on biological minor children." Doc. 174-5 at 1. By contrast, IDOC sex offender therapist Dr. Patricia Grosskopf testified that she does not require a polygraph before approving parent-child contact. Doc. 174-6 at 27 (103:8-11). She added, however, that polygraph examinations can play a "treatment" role in sex offender therapy. *Id*. at 27 (104:10-105:11), 28 (108:21-109:9).

The time necessary to be able to make a recommendation about parent-child contact varies dramatically among therapists. Dr. Grosskopf testified that, of the seven individuals for whom she had made a recommendation this past year, the "average … is between two to three weeks, four weeks max" from the start of therapy to a recommendation, though "[t]he longest period of time might have been two months." *Id*. at 19 (73:13-22). Dr. Grosskopf recommended

that one of the Plaintiffs be permitted phone contact with his minor son after a single meeting. Doc. 193 at ¶ 67.

At the other end of the spectrum, Dr. Harris testified that she would need a parolee to participate in therapy for "[a]t least a year" before she would feel comfortable making a recommendation.  Doc. 174-3 at 13 (48:21-49:1).  Dr. Blain testified that, while there was "no set time" to make a recommendation, the parolee's cooperation and compliance with therapy would "probably" take "five, six, seven months."  Doc. 174-4 at 9 (30:2-5).  Dr. Kleppin indicated that a parolee must have "[b]een an active member within the therapeutic milieu … for a minimum of six months" to be in good standing.  Doc. 174-5 at 1 (emphasis deleted); *see also id*. at 2 ("Once the above criteri[a] have been met, client contact with their biological children is no longer in violation of their therapeutic guidelines/rules … .").  No record evidence explains why these providers' minimum treatment times so widely vary.

### E.      "Cross-Offense" Evidentiary Dispute

IDOC asserts that it "restricts individuals who have never committed an offense against a minor from having contact with their children because there is a high risk of cross-offense, *i.e.*, that a sex offender may abuse both adults and children."  Doc. 192-1 at 9 (citing Doc. 194 at ¶ 17).  In support, IDOC cites the testimony of Deputy Chief Dixon and Dr. Grosskopf. Doc. 194 at ¶¶ 17, 70.  Plaintiffs object to the admission of that testimony on the ground that Dixon and Dr. Grosskopf were not disclosed as experts on the subject of cross-offense risk. Doc. 204 at 11-13; Doc. 205 at ¶¶ 17, 18, 70.  IDOC responds that Dixon and Dr. Grosskopf did not offer expert opinion and that, in any event, Plaintiffs solicited the testimony at their depositions.  Doc. 217 at 8-9.

IDOC is correct insofar as Dixon and Dr. Grosskopf explained IDOC's interest in restricting parolees who have never committed an offense against a minor from contacting their

11

children. Doc. 192-1 at 9-10. Plaintiffs' counsel solicited testimony from Dixon, in her capacity as a Rule 30(b)(6) witness, as to why IDOC "restrict[s] individuals who have never committed an offense against a minor from having contact with their own children." Doc. 174-2 at 46 (178:20-23). Dixon answered by pointing to cross-offense risk. *Id*. at 46 (178:24-179:10). Dixon could testify to IDOC's understanding of the risk—*i.e.*, the reason why IDOC adopted this policy—because it falls within Rule 30(b)(6)'s authorization for a witness to testify to "matters known or reasonably available to the organization." *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894-95 (7th Cir. 2004) (citation omitted). Plaintiffs' counsel asked Dr. Grosskopf to explain why she does not consider the victim's age when evaluating the risk of parent-child contact. Doc. 174-6 at 25 (95:16-96:13). In response, Dr. Grosskopf explained her understanding of the relevance (or lack thereof) of the victim's age to the probability of future offenses against children. *Ibid*. The court will therefore consider Dixon's and Dr. Grosskopf's testimony to the extent that IDOC relies on it to establish its interest in this aspect of its policy.

Insofar as IDOC seeks to establish the *actual* probability of cross-over offenses as support for its policy, Plaintiffs are correct that the testimony sets forth expert opinion because it is based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. "[L]ay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 advisory committee's note to 2000 amendment (internal quotation marks omitted). Predicting or estimating the probability of cross-offenses clearly falls within the ambit of expert testimony, as it requires specialized knowledge in the field of statistics, criminology, psychology, or related disciplines. That Dixon and Dr. Grosskopf referenced studies as the basis for their understanding of the risk confirms this conclusion. Doc. 174-2 at 46 (178:24-179:2) ("Some

time ago … I read a study that was done, and there's a pretty high percentage of cross offense … ."); Doc. 174-6 at 25 (96:5) (referencing "crossover research" to establish the likelihood of cross-offenses).

IDOC did not disclose Dixon or Dr. Grosskopf as experts under Civil Rule 26(a)(2). It follows that IDOC may not use their expert opinions unless its failure to disclose "was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1); *see Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) ("[T]he sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless."). IDOC makes no effort to meet its burden, thereby forfeiting the point for purposes its effort on summary judgment to establish cross-offense risk as a factual matter.

### F. Experiences of Individual Class Members

As the court's class certification opinion described, Plaintiffs are parents of minor children and are serving MSR terms following their convictions in Illinois state court of crimes that require registration as sex offenders. 2020 WL 6581648, at *2.

Montoya was convicted of criminal sexual assault of a 14-year-old boy in 2015. Doc. 174-22 at ¶¶ 2-3. Prior to her release on MSR, she sought a court order allowing contact with her minor children, which her sentencing judge granted. Doc. 193 at ¶ 15. Nonetheless, IDOC did not permit Montoya to live with her daughter until her parole agent approved a safety plan. Doc. 174-22 at ¶ 9. As noted in the court's class certification opinion, Montoya has lived at her family home with her children since August 2019. 2020 WL 6581648, at *5.

Molina was convicted of criminal sexual assault of a 15-year-old girl. Doc. 193 at ¶ 82. He began serving an MSR term on September 28, 2018. *Ibid*. Molina is the father of a son, G.S. *Id*. at ¶ 83. Molina was not permitted to have any contact with G.S. from the time he was released until G.S. turned 18 years old. *Ibid*.

Blaye was convicted of criminal sexual assault of a 21-year-old woman in 2008. *Id*. at ¶ 69. He began serving an MSR term on June 10, 2019. *Ibid*. From the time of his release until November 19, 2019, Blaye was not permitted to have any contact with his minor son, Z.M. *Id*. at ¶¶ 70, 76. Blaye did not receive permission to have in-person visits with Z.M. until January 27, 2020. *Id*. at ¶ 77. The parties dispute when Blaye first requested contact with his son, and consequently the reason why he was unable to have contact until five months after his release. *See id.* at ¶¶ 72, 75-77.

Absent class member Brandon Velna is the father of three children. *Id*. at ¶ 142. He began serving an MSR term on August 5, 2019. *Ibid*. Since his release, he has not been allowed to have any in-person contact with his children. *Id*. at ¶ 143. Velna has attended sex offender therapy since November 2019, and has taken and passed a polygraph examination. *Id*. at ¶ 144. Nonetheless, his therapist has not recommended that he be allowed to have contact with his children, *id*. at ¶ 145, and his request for contact was denied based on the lack of support from the therapist, *id*. at ¶ 147. Velna attempted to appeal the denial. *Id*. at ¶¶ 148-149. Given that he has not been permitted contact, *id*. at ¶ 143, it appears that the appeal was denied.

## Discussion

### I.     Claims Before the Court

In moving for class certification, Plaintiffs identified several common questions that they believed could be resolved on a classwide basis. Doc. 134 at 7-16. The court agreed with Plaintiffs in part and certified four common questions to be tried as a class action: "(1) whether the IDOC child contact policy's presumptive 35-day ban on parent-child contact violates procedural due process; (2) whether the policy's presumptive 35-day ban violates substantive due process; (3) whether certain criteria IDOC uses to make parent-child contact determinations under its policy violate substantive due process; and (4) whether the lack of a neutral

14

decisionmaker violates procedural due process." Doc. 165. As to the third question, Plaintiffs

named five allegedly unconstitutional criteria: (1) not having taken a polygraph, (2) insufficient

duration of therapy; (3) denial of the parolee's guilt by the parolee or the child's custodial parent;

(4) noncompliance with conditions of parole; and (5) unreliable attendance at therapy. Doc. 134

at 9. (As discussed below, IDOC policy makes clear that the third criterion operates only on the

child's guardian and the chaperone supervising a parolee's contact with a child, not on the

parolee or the child's custodial parent.) The court certified the question relating to the five

criteria to "resolve, as a general matter, whether those criteria … are permissible under the

governing due process standard." 2020 WL 6581648, at *12.

In moving for summary judgment, Plaintiffs address the four certified questions, arguing

that the 35-day ban violates procedural due process, Doc. 171 at 61-65, and substantive due

process, *id*. at 41-48; that the five criteria violate substantive due process, *id*. at 52-54; and that

there is not a sufficiently neutral decisionmaker, *id*. at 68-69. But Plaintiffs' summary judgment

motion also raises, for the first time in this case, three entirely new challenges to the IDOC

policy: that the absence of any "formal criteria or standards" violates substantive due process, *id*.

at 49-52; that IDOC's procedures afford insufficient notice and opportunity to be heard, thereby

violating procedural due process, *id*. at 65-68; and that the policy discriminates based on wealth

in violation of the Equal Protection Clause, *id*. at 72-76.

This opinion will not address those new challenges. True enough, as a general matter,

"the fact that the complaint omits a legal theory cannot block a plaintiff from invoking that

theory" on summary judgment, particularly when the court itself injects the theory into the case.

*Koger v. Dart*, 950 F.3d 971, 974-75 (7th Cir. 2020). In a class action, however, "[a]n order that

certifies a class action must define … the class claims, issues, or defenses." Fed. R. Civ.

P. 23(c)(1)(B). In accordance with Rule 23(c)(1)(B), the court specified four questions to be resolved through this class action. Doc. 165. Plaintiffs cannot obtain classwide relief based on any other claims or issues.

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), is instructive on this point. The plaintiffs there proposed four theories of antitrust impact, but the district court certified only one—the "overbuilder theory"—for classwide treatment. *Id*. at 31. Before deciding whether the district court should have certified that question, the Court observed: "If [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court." *Id*. at 35. That result followed from "straightforward application of class-certification principles," not any peculiarity of "substantive antitrust law." *Id*. at 34.

Similarly, the class here can obtain injunctive or declaratory relief based only on the questions that have been certified for classwide treatment. It is possible that Plaintiffs, in a non-representative capacity, could pursue individual claims based on theories of liability not covered by the class certification order. *See id*. at 31 n.3 ("The other theories of liability may well be available for the plaintiffs to pursue as individual actions."). But that possibility is not before the court, as Plaintiffs move for summary judgment as to the class. *E.g.*, Doc. 171 at 73 (contending that IDOC's policy "denies indigent or impoverished class members" equal protection). The court therefore limits its analysis to the certified questions.

IDOC also argues that the court cannot consider the newly asserted equal protection claim because Molina, the ostensible class representative for that claim, no longer has a minor child, rendering his claims moot. Doc. 192-1 at 12, 50. At the time of class certification, Molina had not been permitted contact with his 17-year-old son, but his son has since turned 18.

Doc. 193 at ¶ 83; Doc. 197 at 2. The parties agree that this fact renders moot any equal protection claim that Molina might try to bring. Doc. 192-1 at 12; Doc. 204 at 58. But there is no need to address IDOC's argument because, as noted, the court will not address the equal protection claim for a different reason.

The mootness of Molina's claim does not affect the court's jurisdiction to resolve the class claims. First, there are two other class representatives, Montoya and Blaye, who still have live claims despite having gained permission to contact their children. 2020 WL 6581648, at *5-8. Second, even if Montoya's or Blaye's claims have become moot, the class itself is a distinct entity that can carry on even if the class representative's individual claims become moot: "[W]hen a district court certifies a class, the class of unnamed persons described in the certification acquires a legal status separate from the interest asserted by the named plaintiff, with the result that a live controversy may continue to exist, even after the claim of the named plaintiff becomes moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) (internal quotation marks and alterations omitted); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) ("[W]hen the claim of the named plaintiff becomes moot after class certification, a 'live controversy may continue to exist' based on the ongoing interests of the remaining unnamed class members.") (quoting *Genesis*, 569 U.S. at 74); *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (similar); *Doe v. Cook Cnty.*, 798 F.3d 558, 560 (7th Cir. 2015) (holding that because the suit had "been certified as a class action … the fact that the representative plaintiffs are no longer [detained] does not make the case moot"); *Payton v. Cnty. of Kane*, 308 F.3d 673, 681 (7th Cir. 2002) ("[W]here a class has been properly certified, even the mootness of the named plaintiff's individual claim does not render the class action moot.").

## II.    Application of the *Turner* Standard to Plaintiffs' Claims

IDOC argues that the standard articulated in *Turner v. Safley*, 482 U.S. 78 (1987), which arose in the prison context, governs Plaintiffs' substantive due process claims.  Doc. 192-1 at 13. Plaintiffs contend that the *Turner* standard does not apply because they are on parole, not in prison, and because they allege the abridgement of a fundamental right.  Doc. 171 at 39; Doc. 204 at 20-22.  IDOC is correct.

*Turner* holds that "federal courts must take cognizance of the valid constitutional claims of prison inmates," but that courts must "accord deference to the appropriate prison authorities." 482 U.S. at 84-85.  To accommodate those competing concerns, *Turner* articulates "a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and to the need to protect constitutional rights."  *Id*. at 85 (internal quotation marks and alteration omitted).  The four-factor test considers: "[1] whether the [prison] regulation has a 'valid, rational connection' to a legitimate governmental interest; [2] whether alternative means are open to inmates to exercise the asserted right; [3] what impact an accommodation of the right would have on guards and inmates and prison resources; and [4] whether there are 'ready alternatives' to the regulation."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quoting *Turner*, 482 U.S. at 89-91).  "*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  *Id*. at 136.

"The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts."  *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010); *see also Van den Bosch v. Raemisch*, 658 F.3d 778, 785 n.6 (7th Cir. 2011) ("Though each of the factors is relevant in assessing the reasonableness of a regulation, we have previously observed that the

first factor serves as a threshold, and the district court need not explicitly articulate its consideration of each one.") (internal quotation marks omitted). For example, in *Nigl v. Litscher*, 940 F.3d 329 (7th Cir. 2019), a prisoner challenged the prison's denial of his request to marry, and prison officials relied only on the first factor to defend the denial. *Id*. at 333-34 & n.3. The Seventh Circuit affirmed summary judgment for the officials, reasoning that the denial "was reasonably related to [the officials'] legitimate penological interests in preserving the security of the prison, inducing compliance with and promoting respect for the prison's rules governing inmate contacts, and rehabilitating [the plaintiff]." *Id*. at 334.

Under *Turner*, "[t]he burden … is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at 132; *see also Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007) ("When challenging the reasonableness of the prison's regulation, the inmate bears the burden of persuasion."). Even so, "prison officials must still articulate their legitimate governmental interest in the regulation and provide some evidence supporting their concern." *Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir. 2015) (internal quotation marks omitted). On summary judgment, inferences as to disputed issues of material fact are drawn against the moving party, but "inferences as to disputed matters of professional judgment are governed by *Overton*, which mandates deference to the views of prison authorities." *Singer*, 593 F.3d at 534.

*Turner*'s deferential standard applies even where a plaintiff alleges the deprivation of a fundamental right. *Turner* itself involved a fundamental right—the right to marry. *See* 482 U.S. at 96-99 (recognizing "a constitutionally protected marital relationship in the prison context," and striking down the prison's marriage regulation because it was "not reasonably related to legitimate penological objectives"). *Turner* also applies to prison regulations that restrict contact

with the prisoner's children, the fundamental right at issue here. *See Easterling v. Thurmer*, 880 F.3d 319, 323 (7th Cir. 2018) ("[P]rison officials may violate the Constitution by permanently or arbitrarily denying an inmate visits with family members in disregard of the factors described in *Turner* and *Overton*."); *Flynn v. Burns*, 289 F. Supp. 3d 948, 963 (E.D. Wis. 2018) (holding that a prison official was entitled to qualified immunity in a child contact case and that *Turner* "did not suggest that the test should be something different when a fundamental right is at stake").

The question remains whether *Turner* applies in the parole context. The Seventh Circuit in *Felce v. Fiedler*, 974 F.2d 1484 (7th Cir. 1992), held that it does. *Felce* was a procedural due process challenge to Wisconsin's forced administration of antipsychotic drugs to parolees. *Id*. at 1488. Although no substantive due process challenge was brought, *Felce* explained that the "first task" in the procedural due process analysis was "to determine 'the contours of the substantive right' [at issue] by defining 'the protected constitutional interest' and the 'conditions under which competing state interests might outweigh it.'" *Ibid*. (quoting *Washington v. Harper*, 494 U.S. 210, 220 (1990)). That analysis is required because procedural due process regulates deprivations of established substantive rights. *See Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972) ("The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."); *Khan v. Bland*, 630 F.3d 519, 529 (7th Cir. 2010) ("Because [the plaintiff] is not afforded a substantive right to participate in the program, he is not afforded procedural due process rights upon denial.").

In accord with these principles, *Felce* first asked whether the plaintiff could "claim a liberty interest in mandatory release parole without unwanted administration of antipsychotic drugs." 974 F.2d at 1488. To answer that question, the Seventh Circuit applied the *Turner* standard, recognizing that there was an established liberty interest "in being free from the

involuntary use of such drugs." *Id*. at 1494. In so holding, the Seventh Circuit pointed to the Supreme Court's ruling in *Washington v. Harper* that *Turner* restricted the scope of an inmate's right to refuse antipsychotic drugs, 494 U.S. at 223-24, and observed that "this basic analysis is just as applicable to parole as to prison situations." 974 F.2d at 1494. And the Seventh Circuit concluded that "the liberty interest against involuntary use of antipsychotic drugs guaranteed by the Due Process Clause for parolees *is essentially the same* as that recognized for those incarcerated in an institutional setting." *Id*. at 1495 (emphasis added). *Felce* therefore establishes that *Turner* governs the substantive rights of parolees, not just the substantive rights of prisoners.

This aspect of *Felce* accords with the principle, discussed in this court's opinion denying dismissal of Plaintiffs' substantive due process claim, 2019 WL 296556, at *3, that "the 'conditions' of parole *are* the confinement" for purposes of collateral challenges to criminal convictions. *Williams v. Wisconsin*, 336 F.3d 576, 579 (7th Cir. 2003); *see also Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (equating "incarceration" and "the restriction imposed by the terms of the parole" in evaluating the mootness of a parolee's collateral attack on his conviction); *Maleng v. Cook*, 490 U.S. 488, 491 (1989) ("[A] prisoner who ha[s] been placed on parole [is] still 'in custody' under his unexpired sentence."). The analogy between prison and parole is why Plaintiffs cannot challenge the fact that IDOC imposes the no-contact condition itself; rather, they may challenge only the manner in which IDOC implements that condition. 2019 WL 296556, at *4 (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). Given that Plaintiffs remain "in custody" while they are on MSR, it stands to reason that *Turner* governs the substantive scope of their constitutional rights.

Pressing the opposite view, Plaintiffs cite two out-of-circuit decisions—*United States v. Myers*, 426 F.3d 117 (2d Cir. 2005), and *United States v. Loy*, 237 F.3d 251 (3d Cir. 2001)—that subjected federal supervised release conditions implicating fundamental rights to strict scrutiny. Doc. 171 at 39. Neither case cited *Turner* or its progeny, and neither discussed why *Turner* would not apply in this context. *Myers* relied on *Washington v. Glucksberg*, 521 U.S. 702 (1997), for the proposition that supervised release conditions are subject to strict scrutiny, 426 F.3d at 126, but *Glucksberg* did not concern prison or parole, 521 U.S. at 705-06. *Myers* and *Loy* therefore are not persuasive. Plaintiffs also cite *People v. Morger*, 160 N.E.3d 53 (Ill. 2019), which invalidated under the First Amendment a probation condition for sex offenders. *Id*. at 69-70. Like *Myers* and *Loy*, *Morger* provides no support for its implicit holding that *Turner* does not affect the First Amendment analysis, and likewise is neither controlling nor persuasive in the face of *Felce*'s contrary authority.

*Turner* does *not* furnish the standard for determining whether a plaintiff received the process due under the Due Process Clause. Rather, as IDOC itself observes, Doc. 192-1 at 29, the familiar *Mathews v. Eldridge* factors govern that inquiry:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976). *Turner* remains relevant, however, because it governs the scope of "the private interest that will be affected," in this case a parolee's interest in enjoying contact with his or her minor children. *See Bleeke v. Server*, 2010 WL 299148, at *7 (N.D. Ind. Jan. 19, 2010) ("Although *Turner* is a *substantive* due process case, the *Felce* court nevertheless looked to it in determining the scope of the liberty interest in the context of a *procedural* due process

claim."). But *Turner* does not displace *Mathews* as the overarching framework for the procedural due process analysis. *See id.* at *9-13 (applying *Turner* to determine the scope of the substantive right at issue, but applying *Mathews* to determine whether the procedures offered satisfied due process).

The Supreme Court's decision in *Washington v. Harper* illustrates this two-step process. After noting that "identifying the contours of the substantive right remains a task distinct from deciding what procedural protections are necessary to protect that right," 494 U.S. at 220, the Court applied *Turner* to determine the scope of a prisoner's right to refuse antipsychotic medication, holding that *Turner* allows forced treatment "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest," *id.* at 222-27. Turning to the procedural component of the analysis, the Court weighed the *Mathews* factors to determine what "procedural protections" were required before administering such treatment. *Id.* at 229. The Court's procedural analysis did not cite or rely on *Turner*'s "rational connection" test, nor did it ask whether the plaintiff had identified a "ready alternative" to the existing procedures. *Id.* at 229-36. So *Turner* applies to this case, but only in ascertaining the scope of Plaintiffs' substantive rights, not the procedural protections to which they are entitled.

## III.    No-Contact Condition

### A.    Substantive Due Process

In addressing Plaintiffs' substantive due process challenge to the no-contact condition, the court must apply the *Turner* standard to determine the scope of the liberty interest they enjoy in having contact with their minor children upon their release on MSR. "[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion); *accord id.* at 77 (Souter, J., concurring). This substantive due process

23

right includes a "right to familial relations" that protects against "forced separation" of parents and children. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 & n.14 (7th Cir. 2000). Because parents enjoy this liberty interest, as a general rule a State "has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 1019.

As IDOC correctly notes, Doc. 192-1 at 14-15, *Troxel* and *Brokaw* do not involve parents who were in prison or on parole. But the mere fact that Plaintiffs are parolees does not extinguish their constitutional right to familial association. Like prisoners, parolees "retain a limited constitutional right to intimate association." *Easterling*, 880 F.3d at 322. That right derives from the liberty interest in "a parent's right to enjoy the companionship of his children." *United States v. Lee*, 950 F.3d 439, 448 (7th Cir. 2020); *accord id.* at 451 (St. Eve, J., concurring in part and dissenting in part) ("[P]arents have a liberty interest, protected by the Constitution, in having a reasonable opportunity to develop close relations with their children.") (quoting *Hodgson v. Minnesota*, 497 U.S. 417, 484 (1990) (Kennedy, J., concurring in part and dissenting in part)). The no-contact condition burdens that liberty interest by presumptively denying sex offenders on MSR contact with their children for 35 days after their release from prison.

That burden does not necessarily render the no-contact condition unconstitutional. In the parole context, even fundamental rights may be limited by restrictions that are "reasonably related to legitimate penological interests." *Easterling*, 880 F.3d at 322 (quoting *Turner*, 482 U.S. at 89). IDOC maintains that the no-contact condition is rationally related to its interests in the "rehabilitation of sex offenders on parole," "increasing compliance and respect for rules governing relationships while on parole," and the "protection of the general public, especially children." Doc. 192-1 at 16-17; *see also* Doc. 205 at ¶ 5 (explaining IDOC's "two main

objectives: (1) assisting the offender to re-acclimate himself back into society and resume a normal life … and (2) community and public safety," including the safety of children). Plaintiffs do not contest the legitimacy of IDOC's asserted interests. Doc. 204 at 23 ("[R]ehabilitation and reintegration are the primary objectives on supervised release."). Under *Turner*, then, the principal question is whether Plaintiffs can identify an "obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost" to IDOC's "valid penological goal[s]." *Overton*, 539 U.S. at 136.

The alternative policy proposed by Plaintiffs is for IDOC to evaluate parolees' requests for contact with their children before their release on MSR using the pre-release evaluations and SVP screenings that IDOC already conducts on sex offenders shortly before their release. Doc. 171 at 45 (complaining that IDOC's policy "defers until after release the decision whether a releasee will be permitted to have contact with his minor child while on MSR"). In support, Plaintiffs argue that those evaluations collect and assess evidence about the risks to children that will be posed by sex offenders on their release. *Id.* at 47.

The record includes evidence suggesting that the pre-release evaluations and SVP screenings provide data about parolees that is at least potentially relevant to IDOC's penological interests in rehabilitation and community safety. Brown-Foiles's testimony highlighted the potential utility of those evaluations for sex offender parolees' treatment providers. Doc. 174-7 at 26 (100:9-13) (testifying that a pre-release evaluation is "a very valuable tool for a treatment provider"); *id*. at 30 (115:20-21, 116:1-16) (testifying that "[SVP screenings] could be informative for a future treatment provider," and adding that "[i]t's just much more in depth and contains a lot of information" compared to the pre-release screening). The record also includes evidence suggesting that those evaluations can help IDOC meet its community safety goals. The

"standard" IDOC uses for approving contact between parolees and their children is whether the parolee is "low risk, no risk" for posing danger to a child. Doc. 193 at ¶ 19. The SVP screening could help determine whether a parolee satisfies that standard because, as Brown-Foiles put it, the "criteria might look the same" or be "similar" to the criteria used by "somebody who is evaluating a risk of contact with children." Doc. 174-7 at 38 (147:19-148:9). The SVP screening also uses "actuarial-based assessment tools," Doc. 193 at ¶ 65, that apparently produce a "score from which [IDOC] could derive a risk level," Doc. 174-7 at 30 (114:11-12). (By contrast, the pre-release evaluation "does not have a risk component" in that "[i]t does not look to predict futur[e] risk." *Id*. at 24 (91:11-13); *accord id*. at 25 (96:16-18). But a "formal risk assessment" by a therapist is not required as part of the post-release evaluations, either. Doc. 193 at ¶ 20.) This evidence supports an inference that evaluations conducted before a parolee's release, based on the information already available to IDOC, are a possible alternative to the post-release evaluations conducted by the containment team.

That said, other record evidence suggests that there are meaningful differences between pre-release screenings of prisoners and post-release evaluations of parolees. For example, IDOC does not currently administer polygraphs as part of its pre-release evaluations, Doc. 205 at ¶ 114, which IDOC posits as one reason why "[s]olely relying upon [those evaluations] is insufficient," *id*. at ¶ 51. Whether IDOC could conduct the polygraphs prior to release is unclear. It appears possible that many, if not all, of the questions asked during a parolee's post-release polygraph exam could be asked in a pre-release polygraph. *Id*. at ¶ 81 ("The questions for the initial polygraph depend on the client's sexual history, but could include whether the client has ever viewed child pornography, whether the client has ever engaged anyone in non-consensual sexual contact, whether the client has had any sexual contact with other minors as an adult, whether the

client has engaged in any peeping or exposing behaviors, whether the client has ever used force in the instances of a rape or sexual assault charge, or whether the client has ever had sexual contact with anyone who might have been asleep or drunk."). But the record does not compel an inference or conclusion in either party's favor concerning the effectiveness of that alternative.

IDOC cites Dr. Blain's and Brown-Foiles's testimony that evaluations conducted while an offender remains incarcerated inherently cannot account for how that offender will react as a parolee to the conditions and stressors in the outside world. *Id*. at ¶¶ 52, 54, 109. That testimony supports the inference that there is some disadvantage to making initial determinations about parent-child contact before an offender is released on MSR. Still, the court cannot conclusively decide on the present record whether that disadvantage is *de minimis*. *See Turner*, 482 U.S. at 91 (holding that the existence of "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests" is "evidence that the regulation does not satisfy the reasonable relationship standard").

Brown-Foiles testified that the pre-release evaluation conducted by IDOC "could be used to inform the decision about whether someone should have contact with his or her child, but it is not a single source of information." Doc. 205 at ¶ 110; *see also* Doc. 193 at ¶ 63. Similarly, Dr. Blain testified that, at least in some cases, it would be possible to make a recommendation about parent-child contact based on a pre-release evaluation. Doc. 174-4 at 23 (87:12-18); *id*. at 24 (90:21-91:13). And Dr. Blain agreed that an IDOC evaluator could conduct a valid risk assessment before an offender is released on MSR. *Id.* at 24 (90:4-6). He cautioned, however, that it may not be possible to assess all relevant factors before release. *Id.* at 23 (89:22-24); *id*. at 24 (91:7-11). The record therefore gives rise to a genuinely disputed issue of material fact: the utility of pre-release evaluations and SVP screenings, and whether using such evaluations can

27

advance IDOC's penological goals with no more than a *de minimis* cost. *See Beard v. Banks*, 548 U.S. 521, 535 (2006) (plurality opinion) ("*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."). A trial is necessary to fully develop the record as to the disadvantages, if any, that Plaintiffs' proposed alternative policy would impose on IDOC's penological goals, and therefore as to whether the no-contact condition satisfies *Turner*.

The cross-motions for summary judgment are accordingly denied as to Plaintiffs' substantive due process challenge to the no-contact condition.

### B. Procedural Due Process

Plaintiffs also claim that the no-contact condition violates procedural due process by denying them (1) a pre-deprivation hearing or, if pre-deprivation hearings are not required, (2) sufficiently prompt post-deprivation determinations. As noted, Plaintiffs have a liberty interest in familial association with their children. The pertinent question for procedural due process purposes is precisely when Plaintiffs are constitutionally entitled to an initial determination of whether they can be deprived of that interest.

### 1. Lack of Pre-Deprivation Hearings

Absent a court order, IDOC policy does not grant parolees a hearing before they are deprived, upon their release, of their liberty interest in familial association. Doc. 192-1 at 36. IDOC argues that a pre-deprivation hearing is not constitutionally required. *Ibid*.

Procedural due process does not always require pre-deprivation process: "[W]here a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake … postdeprivation remedies might satisfy due process." *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). Weighing an asserted liberty interest against the burdens of a pre-deprivation hearing is "a special case of the general *Mathews v. Eldridge* analysis." *Id*. at 128. Applying *Mathews*, the

Seventh Circuit recognized in *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463 (7th Cir.

2011), the general rule that, absent exigent circumstances, pre-deprivation process is required

before removing children from their parents' custody. *Id.* at 486 ("[G]overnment officials may

remove a child from his home without a pre-deprivation hearing and court order if the official

has probable cause to believe that the child is in imminent danger of abuse."). But that general

rule does not necessarily apply in the parole context, as procedural due process analysis is

"flexible" and must be tailored to the "particular situation." *Mathews*, 424 U.S. at 334 (quoting

*Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The parties do not identify any precedent

deciding whether *Hernandez* applies in the parole context, so the court will undertake that

analysis in the first instance.

The first *Mathews* factor is "the private interest that will be affected by the official

action." 424 U.S. at 335. A parent's liberty interest in familial association with minor children

"is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court."

*Lee*, 950 F.3d at 448 (internal quotation marks and alteration omitted). That long pedigree

reflects the undeniable importance of the liberty interest at stake. *See Brokaw*, 235 F.3d at 1019

("[T]he forced separation of parent from child, even for a short time, represents a serious

infringement upon both the parents' and child's rights.") (quoting *J.B. v. Washington Cnty.*, 127

F.3d 919, 925 (10th Cir. 1997)); *cf. Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)

(noting a parent's "commanding" interest in the accuracy of a decision terminating parental

rights). Given the importance of that liberty interest, a post-deprivation hearing does not afford a

"completely adequate remedy" for its deprivation. *Ellis v. Sheahan*, 412 F.3d 754, 758 (7th Cir.

2005). No matter the outcome of a post-deprivation hearing, parolees can never reclaim the time

they have been separated from their children during the no-contact period following their release. The first *Mathews* factor therefore weighs in favor of pre-deprivation hearings.

The second *Mathews* factor considers "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. Because the no-contact policy (absent a court order) imposes a blanket ban on parent-child contact without regard to individual circumstances or characteristics, there is a significant risk of erroneous deprivation of a parolee's liberty interest. Pre-deprivation process affording at least some consideration of the parolee's circumstances and yielding some individualized assessment of risk would protect against the erroneous deprivation of that interest. But the record does not establish with the necessary clarity how accurately pre-deprivation assessments would predict parolees' individual risks to their children. As noted, some evidence indicates that evaluations already conducted before a parolee's release are likely to have *some* probative value in assessing risk, but other evidence indicates that they are an imperfect substitute for IDOC's post-release evaluations.

Additionally, it is possible that IDOC could implement "specialized evaluations" that, according to Brown-Foiles, could enable an evaluator to make a pre-release risk assessment and render a recommendation. Doc. 193 at ¶ 66. But because Brown-Foiles's testimony on that point was very brief, the record does not contain sufficient evidence for the court to determine the probable value of using such evaluations as a safeguard against erroneous deprivations. Thus, unresolved factual issues mean that the court cannot yet determine in which direction the second *Mathews* factor tilts.

The third *Mathews* factor, IDOC's interests, is equally indeterminate. IDOC undoubtedly has an interest ensuring that parolee-child contact does not pose risks to the child's health and

safety. That interest does not inherently weigh against additional process, for IDOC "shares the parent's interest in an accurate and just decision." *Lassiter*, 452 U.S. at 27. Still, IDOC's interests could be harmed by additional administrative burdens. *See id.* at 28 (recognizing that "the State's pecuniary interest" in avoiding the expense of additional procedural safeguards is "legitimate"). What the record does not establish with any degree of certainty is the magnitude of that burden.

The undisputed fact that additional process would impose *some* burden on IDOC's resources does not warrant summary judgment for IDOC because the court must weigh that burden against the countervailing factors, including the significant liberty interest at stake and the value of additional process. The record is not sufficiently developed at this juncture for the court to make that determination. Specifically, IDOC cites no record evidence regarding the costs of using the information obtained from evaluations conducted before an offender's release, whether in terms of staff time or other resources. And while Brown-Foiles testified that the "specialized evaluations" are "very expensive," Doc. 205 at ¶ 112, "very" is a relative term. Brown-Foiles's testimony therefore does not allow the court to compare the costs of "specialized evaluations" to the costs of procedures that due process requires for other government-enforced parent-child separations. *See Felce*, 974 F.2d at 1500 (comparing the burdens of providing additional process for involuntarily medicating a parolee to "those required when the state seeks to medicate an inmate against his will and … must pursue involuntary commitment").

In sum, disputed issues of fact preclude any holding at this juncture that the *Mathews* factors either require or do not require pre-deprivation process. The parties' cross-motions for summary judgment therefore are denied as to this aspect of Plaintiffs' procedural due process challenge to the no-contact condition.

### 2. Timeliness of Post-Deprivation Hearings

On the assumption that procedural due process does not require pre-deprivation

determinations, a trial is likewise necessary to determine whether IDOC's policies are

unconstitutional because of the delays in providing post-deprivation determinations.  Due

process requires that post-deprivation determinations be "sufficiently prompt."  *Doyle v. Camelot*

*Care Ctrs., Inc.*, 305 F.3d 603, 618 (7th Cir. 2002); *see also Brokaw*, 235 F.3d at 1021 (holding

that when pre-deprivation hearings are not required, post-deprivation review must be "prompt

and fair").  The degree of promptness required is determined by balancing "the importance of the

private interest and the harm to the interest occasioned by the delay; the justification offered by

the Government for the delay and its relation to the underlying governmental interest; and the

likelihood that the interim decision may have been erroneous."  *FDIC v. Mallen,* 486 U.S. 230,

242 (1988).  That balancing test merely "rephrase[s]" the *Mathews* test for cases alleging an

unconstitutional delay in providing post-deprivation process.  *DeVito v. Chi. Park Dist.*, 972 F.2d

851, 855 (7th Cir. 1992).

The first *Mathews* factor weighs against the 35-day delay because, as discussed above,

even a brief parent-child separation imposes a serious intrusion on a parolee's interest in familial

association.  *See Brokaw*, 235 F.3d at 1019.  If due process permits IDOC to defer

determinations until after a parolee's release, the parolee will have a significant interest in the

post-release determination occurring as quickly as possible.

As to the second *Mathews* factor, IDOC offers two principal justifications for the delay in

making initial parent-child contact determinations.  First, it contends that therapists need

flexibility to make an individualized assessment about a parolee's rehabilitation after release,

which necessarily requires some delay between the release and an initial determination.

Doc. 192-1 at 38-39. Second, IDOC asserts that limitations on its resources—in particular, its staff—constrain the speed with which it can process parolees' requests for child contact and appeals from denials of those requests. *Id*. at 40. Those justifications are facially legitimate. But, again, the record at this juncture does not establish with the requisite level of certainty the strength of the relationship between these justifications and IDOC's underlying interests. The parties do not cite record evidence about how administratively burdensome it would be for IDOC to make initial determinations in less than 35 days after an offender's release on MSR given the information it already collects prior to release.

The third factor, the likelihood of an erroneous interim decision, favors Plaintiffs. Because the 35-day no-contact period effectively operates as a blanket ban, there is a high likelihood of making erroneous determinations. That is particularly true because there is no threshold, pre-deprivation step ensuing that deprivation is "not baseless." *Gilbert v. Homar*, 520 U.S. 924, 934 (1997) (explaining that, in the absence of a pre-deprivation hearing, a threshold step can "provide[] adequate assurance that the [deprivation] is not unjustified"). That said, the court cannot determine this factor's relative weight without evidentiary development about the probative value of pre-deprivation hearings.

Accordingly, the parties' cross-motions for summary judgment as to this aspect of Plaintiffs' procedural due process challenge to the no-contact conditions are also denied.

## IV. Criteria Used to Evaluate Child Contact Requests

As noted, Plaintiffs challenge on substantive due process grounds five specific criteria that IDOC uses to determine whether and, to what extent, parolees can have contact with their children. Each challenged criterion is considered in turn.

### A.      Polygraph Requirement

The first criterion is whether the parolee has taken a polygraph examination.  IDOC

policy permits a containment team to deny a request for parent-child contact indefinitely until a

parolee takes a polygraph exam.  Doc. 193 at ¶ 32.  The policy also gives therapists the

discretion to object or withhold approval for contact until a parolee passes a polygraph.  *Id*. at

¶ 31.  Consistent with this policy, the Parolee/Releasee Determination of Request for Contact

with Child(ren) form has a checkbox indicating that one standard reason for denying a parent-

child contact request is that the parolee's "[t]herapist requested polygraph but results are not

available."  Doc. 174-1 at 3.  And the safety plan requires parolees to initial a "requirement" that

"[t]he parolee has successfully completed and passed a sexual history OR maintenance

polygraph."  *Id*. at 5.  Despite the seemingly mandatory nature of this "requirement," Deputy

Chief Dixon testified that a polygraph "could be something that's not applicable."  Doc. 174-2 at

23 (87:5-8).

The record includes testimony from therapists indicating that they view polygraphs as

valuable tools for their clinical practice.  As noted, Dr. Harris and Dr. Blain testified that they

believe polygraphs provide useful information about whether a parolee's offense history

disclosures have been truthful and complete.  Doc. 205 at ¶¶ 44, 86-87, 91-92, 96.  IDOC cites

that testimony in arguing that the use of polygraphs is reasonably related to a therapist's decision

whether to recommend parent-child contact.  Doc. 192-1 at 27.  Plaintiffs respond that the

therapists' testimony about the utility and reliability of polygraphs should be stricken as expert

opinion because IDOC did not disclose Drs. Harris and Blain as experts under Civil

Rule 26(a)(2).  Doc. 205 at ¶¶ 86-87, 93-94.

Assuming that Drs. Harris and Blain conveyed expert opinion regarding polygraphs,

IDOC's failure to make the proper disclosures is harmless.  *See* Fed. R. Civ. P. 37(c)(1) ("If a

34

party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion … unless the failure was substantially justified or is harmless.").  As IDOC observes, Doc. 217 at 8-9, Plaintiffs subpoenaed Drs. Harris and Blain for deposition and asked them questions about the use of polygraphs, and the testimony Plaintiffs now seek to strike was offered in response to those questions.  Because Plaintiffs solicited the therapists' testimony and knew its substance, they can hardly complain or feign surprise that IDOC seeks to rely on that testimony.  Any failure of disclosure was therefore harmless.  *See Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 888 (7th Cir. 2004) (affirming the district court's harmlessness finding where the party seeking to exclude an expert's opinion participated in the expert's deposition and knew of the opposing party's intent to rely on that opinion).

Moreover, even setting aside the therapists' testimony, there remains undisputed evidence in the record to support IDOC's use of the polygraph criterion.  Brown-Foiles testified that "[n]ot every treatment provider uses polygraphs, but … it is a part of best practice that polygraphs really do benefit the treatment provider and the client."  Doc. 174-7 at 18 (66:20-23).  Under the *Turner* standard, Brown-Foiles's testimony on this matter of professional judgment is sufficient to articulate the legitimate governmental interest in requiring polygraphs, as it "provide[s] some evidence supporting [IDOC's] concern."  *Riker*, 798 F.3d at 553.  Accordingly, the burden shifts to Plaintiffs to provide sufficient evidence disproving the validity of the requirement.  *See Beard*, 548 U.S. at 530 ("Unless a prisoner can point to sufficient evidence regarding such issues of [professional] judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.").

In attempting to meet their burden, Plaintiffs cite only a district court decision, *United States v. Moultrie*, 552 F. Supp. 2d 598, 601-02 (N.D. Miss. 2008), holding that the results of certain polygraph examinations were insufficiently reliable to be admitted in a criminal trial under Evidence Rule 702.  Doc. 205 at ¶¶ 86-87, 93-94.  In reaching its conclusion, the district court relied heavily on a finding by the National Academy of Sciences that the accuracy of polygraphs "may be highly variable."  *Moultrie*, 552 F. Supp. 2d at 601 (quoting Comm. to Review the Sci. Evid. on the Polygraph, Nat'l Rsch. Council, *The Polygraph and Lie Detection* 214 (2003)).  Even accepting *Moultrie* as correct, the "circumstance" addressed there, "as written about in [a] court opinion[], cannot provide sufficient support" for Plaintiffs' position in this case.  *Beard*, 548 U.S. at 534 (holding that a prisoner did not meet his burden in opposing summary judgment by citing court opinions generally suggesting that a less restrictive prison policy would promote rehabilitation).  *Moultrie* did not address the relevant context here—the use of polygraph examinations as part of therapy for parolees convicted of sex offenses.  *See ibid*. (noting that judicial opinions are particularly inapt when they "were not considering contexts" analogous to the context in question).  Plaintiffs therefore fail to raise a genuine dispute of material fact as to the validity, as a general matter, of IDOC's polygraph requirement.

IDOC is not entitled to summary judgment, however, due to questions arising from Plaintiff's submission that the polygraph requirement violates substantive due process because some parolees "can't afford to take[] a polygraph examination."  Doc. 171 at 53.  A therapist may withhold support for parent-child contact because a parolee cannot afford a polygraph exam.  Doc. 193 at ¶ 49.  Yet IDOC does not articulate a legitimate governmental interest in denying parolees' contact with their children based on inability to pay for a polygraph.  Deputy Chief Dixon testified that a therapist's decision on whether to withhold support for parent-child contact

36

due to a parolee's inability to pay was "up to the therapist." Doc. 174-2 at 42 (163:5-13). That explanation fails to establish a logical connection between a parolee's ability to pay for a polygraph and IDOC's penological interests. Accordingly, Plaintiffs' substantive due process challenge to the polygraph criterion will proceed to trial so that the parties may develop an evidentiary basis for determining whether IDOC's penological interests are rationally related to the requirement that parolees pay for their own polygraphs without regard to their financial resources.

### B.        Insufficient Duration of Therapy

The second contested criterion is insufficient duration of therapy. Under IDOC policy, a therapist can decline indefinitely to make a recommendation regarding parent-child contact. Doc. 193 at ¶ 30. Deputy Chief Dixon testified that if a therapist does not feel comfortable making a recommendation because of a parolee's insufficient time in therapy, "the therapist will also list reasons" for that discomfort. Doc. 174-2 at 28 (107:9-11).

Construing the record in the light most favorable to Plaintiffs, there is evidence in the record that this criterion is arbitrary and therefore not reasonably related to IDOC's interests. *See Turner*, 482 U.S. at 89-90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."). Specifically, the record can support an inference that the required duration of therapy varies based on the therapist's proclivities and practices, not on the parolee's history and circumstances. Dr. Harris testified that she "'would need to sit with [the parolee] for *at least a year*' … if asked to make a recommendation about whether the person should have contact with their children." Doc. 205 at ¶ 41 (emphasis added). By contrast, Dr. Grosskopf testified that "the average time for her to recommend contact with a child is two to three weeks, *four weeks max*, and that depends on … availability … . The longest period of time to recommend contact

with a child might have been two months in those cases where she rendered recommendations in the last year." *Id*. at ¶ 69 (emphasis added). Drawing reasonable inferences in Plaintiffs' favor, a typical parolee seen by Dr. Grosskopf will have a decision in about a month, while the same parolee would have to wait at least a year if seen by Dr. Harris. There may be some justification for this disparity—for example, Dr. Harris may see parolees with different characteristics than those seen by Dr. Grosskopf—but no such justification is apparent on the record. Doc. 174-6 at 5 (17:10-11) (Dr. Grosskopf's testimony that parolees' referrals to therapists are based on "where they live"). Consequently, a reasonable factfinder could find that parolees with similar characteristics, including recidivism risk and progress in rehabilitation, will be treated far differently for no apparent reason. IDOC therefore is not entitled to summary judgment on the insufficient duration of therapy criterion.

Nor are Plaintiffs entitled to summary judgment on this criterion. IDOC provides parolees with referrals to therapy, Doc. 205 at ¶ 14, but parolees may select their own therapist, *id*. at ¶ 22. Drawing reasonable inferences in IDOC's favor, any variance in the length of time necessary to secure a positive recommendation is not attributable to IDOC, but instead reflects a difference of professional judgment among therapists that the parolees themselves choose. If that is correct, then the duration of therapy criterion is not arbitrary and therefore satisfies the *Turner* standard.

### C. Denial of Guilt

The third challenged criterion arises from a condition in the form safety plan that "the guardian of the child and the approved supervisor [of an in-person visit] may not 'deny, refute, or enable the offender to deny or refute any details of his/her conviction.'" Doc. 193 at ¶ 12 (quoting Doc. 174-1 at 5). Deputy Chief Dixon testified that this condition is intended to ensure the impartiality of the chaperone supervising the parolee's contacts: "If the chaperone is an

enabler, then the chaperone could potentially allow something harmful to the minor to happen during the visit. If the chaperone believed that the offender did do it, then there's animosity there[,] which creates a bad environment for the visit." Doc. 174-2 at 29 (112:23-113:4). The record therefore shows that the denial of guilt criterion operates as a limitation on what the child's guardian or the chaperone of an in-person visit may do and say, not on whether the parolee may maintain his or her innocence in other settings.

Plaintiffs do not contest the legitimacy of IDOC's requirement that parolee-child visits be supervised. Doc. 171 at 71 ("Where necessary, contact can be … subject to close supervision."). And Plaintiffs adduce no evidence disputing the relationship between IDOC's justification for the denial of guilt criterion and its valid goals. IDOC therefore is entitled to summary judgment as to that criterion.

To be clear, this criterion does not categorically prevent parolees themselves from asserting their innocence in an appropriate setting. A parolee's denial of guilt is only "a factor of the entire situation, the entire case," for the containment team to consider, not a dispositive factor that automatically requires denial of a parolee's request for contact with their children. Doc. 174-2 at 30 (113:12-114:16). Plaintiffs do not challenge that aspect of IDOC's policy; instead, they focus only on the denial of guilt condition set forth in the safety plan. Doc. 171 at 45. The court therefore will not consider arguments that Plaintiffs might have advanced to challenge the containment team's consideration of a parolee's denial of guilt as a non-dispositive factor in deciding whether to allow parent-child contact.

### D. Noncompliance with Parole Conditions

The fourth challenged criterion is whether the parolees have complied with their MSR conditions. Doc. 205 at ¶ 12. Although the parties' briefs do not discuss this criterion with any specificity, Docs. 172, 192-1, 204, 217, there is an indisputably logical relationship between a

parolee's compliance with parole conditions and IDOC's interest in the parolee's rehabilitation. *See Overton*, 539 U.S. at 133 (recognizing the "self-evident" connection between a regulation prohibiting prison visitation by former inmates and a state's interest in prison security).

The *strength* of the relationship between this criterion and IDOC's penological interest is not clear, however. Deputy Chief Dixon's testimony establishes only that the containment team "should" consider "the parolee's compliance with the conditions of their parole." Doc. 174-2 at 24 (92:20-23). That brief description does not allow the court to find as a matter of law that this criterion necessarily bears a reasonable relationship to the decision whether to allow parent-child contact. For example, there may be some relatively trivial parole violations that, even under the deferential *Turner* standard, would not warrant automatic denial of a request for parent-child contact. Given this gap in the record, "there is reason to believe the better course would be to proceed to a full trial" as to the parole non-compliance criterion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### E. Unreliable Attendance at Therapy

The fifth challenged criterion is "unreliable attendance at therapy." Doc. 166 at 26. In their briefs, Plaintiffs reframe this criterion as "[t]he parolee's 'participation in therapy' and 'engagement' in therapy." Doc. 171 at 53. This framing is consistent with Deputy Chief Dixon's explanation of how containment teams use that criterion. Doc. 174-2 at 24 (92:24-93:2).

There is an obvious logical connection between a parolee's consistency in attending and participating in therapy, on one hand, and IDOC's rehabilitation goals, on the other. Undisputed record evidence confirms that connection. Doc. 205 at ¶ 68 (Dr. Grosskopf's testimony that she considers "participation in therapy" as a relevant factor in deciding whether to recommend parent-child contact); Doc. 174-3 at 7 (22:8-12) (Dr. Harris's testimony that persons "progress through therapy" by "attend[ing] regularly" and being "consistent"); *id*. at 13 (48:13-20) (Dr.

40

Harris's testimony that attendance and participation at therapy "would give [her] the opportunity to learn about that client"); Doc. 174-4 at 8-9 (29:18-30:1) (Dr. Blain's testimony that a parolee would need to be "attending[,] … on time[,] … working on assignments[,] … [and] contributing to the group" to be in good standing in therapy). Plaintiffs adduce no evidence undermining the reasonable relationship between this criterion and IDOC's rehabilitation goals. IDOC is therefore entitled to summary judgment as to this criterion.

## V.    Neutral Decisionmaker

Finally, Plaintiffs claim that the lack of a neutral decisionmaker in IDOC's procedures for implementing its parent-child contact policy violates procedural due process. The *Mathews* test governs whether due process requires a neutral decisionmaker. *See Felce*, 974 F.2d at 1496. In *Felce*, the Seventh Circuit held that a grievance procedure used by the Wisconsin Department of Corrections to review decisions by parole agents to involuntarily medicate a parolee with psychotropic drugs violated procedural due process. *See id*. at 1500. The court held that Wisconsin's procedure—which included "heavy emphasis upon the judgment of the individual parole agent," *ibid*.—"was insufficiently neutral and independent to guard against an erroneous determination," *id*. at 1498, because it lacked any "provision for review by persons not currently involved in [the parolee's] diagnoses or treatment," *id*. at 1499. The IDOC procedures challenged by Plaintiffs share many of the same features as those invalidated in *Felce*.

First, as in *Felce*, there is a "significant" liberty interest at stake. *Id*. at 1497. As noted, Plaintiffs have a liberty interest in enjoying the companionship of their children. *See Lee*, 950 F.3d at 448; *Easterling*, 880 F.3d at 322. That liberty interest is at least as significant as the liberty interest in *Felce*. "[A] parent's desire for and right to the companionship … of his or her children is an important interest that undeniably warrants deference and, absent a powerful

41

countervailing interest, protection." *Lassiter*, 452 U.S. at 27 (internal quotation marks omitted). The first *Mathews* factor weighs heavily in favor of Plaintiffs.

Second, the lack of an independent decisionmaker creates a significant risk of an erroneous deprivation of Plaintiffs' interests and increases the probable value of additional or substitute procedural safeguards. IDOC's procedures do not require an independent decisionmaker. As noted, a parolee's "containment team … has the authority to decide whether a parolee should have contact with his or her minor child." Doc. 205 at ¶ 9. The team "consists of the parole agent, parole commander, sex offender therapist, any other therapist the offender might be seeing, and the parolee." *Ibid*. Those individuals are all "currently involved in [the parolee's] diagnoses or treatment," and therefore do not qualify as independent decisionmakers. *Felce*, 974 F.2d at 1499.

Moreover, IDOC's appeal process does not provide for independent review of the containment team's decision. Appeals are decided by either the Deputy Chief of Parole or the Deputy Chief's designee (currently Brown-Foiles in her capacity as the coordinator for sex offender services). Doc. 193 at ¶ 44. As the position's title suggests, the Deputy Chief of Parole "supervise[s] … parole officers." Doc. 174-2 at 3 (6:16-17). Deputy Chief Dixon is therefore similarly situated to the reviewing officials in *Felce*, who were held to be insufficiently independent because they "formed a direct line of supervisors above [the parole agent] and thus had individual interests in supporting his decision." 974 F.2d at 1499. The possibility of appeal to Deputy Chief Dixon therefore does not cure the lack of an independent decisionmaker.

IDOC contends that Brown-Foiles is independent because she "is not directly involved in the [parolee's] supervision or in the chain of command." Doc. 193 at ¶ 45. Brown-Foiles, however, testified that some therapists employed by IDOC report directly to her, and that she

"provide[s] oversight and some supervision" even for therapists who are not "technically" her direct reports. Doc. 174-7 at 4 (11:11-12:2). Brown-Foiles further testified that she "play[s] a supervision role to the therapists, to the structure of the treatment groups," *id*. at 7 (22:4-6), and that she "coordinate[s] trainings for parole agents and therapists," including "community therapists" not employed by IDOC, *id*. at 4 (10:9-10, 11:3-4). Given her various roles, Brown-Foiles has an individual interest akin to Dixon's in supporting the therapists' recommendations, as those recommendations are likely to be informed by her supervision or training. As a result, Brown-Foiles does not qualify as an independent decisionmaker in the administrative appeals process. *See Felce*, 974 F.2d at 1499 (explaining that supervisors have an interest in upholding their subordinates' decisions).

Perhaps recognizing this problem, IDOC contends that procedural due process "does not require an independent decisionmaker." Doc. 192-1 at 44. But governing precedent holds that the decisionmaker's independence is an important aspect of procedural due process. As the Seventh Circuit explained, although "a decisionmaker need not be external to an institution to be independent," some degree of independence "provides a significant added dimension of procedural protection to the liberty interest at stake." *Felce*, 974 F.2d at 1499-1500. The second *Mathews* factor therefore weighs against the personnel that IDOC has assigned to make and review parent-child contact decisions.

Third, it is beyond dispute that IDOC has a substantial interest in the protection of children and the rehabilitation of parolees. Still, *Felce* recognizes that the assertion of legitimate interests in protecting the public and rehabilitating parolees, without more, cannot overcome the countervailing factors that favor a neutral decisionmaker. *See id*. at 1500 (holding that, on balance, "the involvement of an independent decisionmaker would benefit significantly the

43

protection of the liberty interest at stake without a significant burden upon either the resources of the state or the substantial interests that the state has in protecting the public and rehabilitating its parolees").  To overcome those countervailing factors, IDOC must establish the "fiscal and administrative burdens" of additional or substitute procedures.  *Ibid*.  On the current record, evidence regarding those burdens is inconclusive at best.  Doc. 192-1 at 43-46; Doc. 217 at 29.

Given the state of the summary judgment record, the court cannot determine whether IDOC's interests outweigh the factors favoring Plaintiffs.  The parties' cross-motions for summary judgment are therefore denied as to Plaintiffs' procedural due process challenge to the personnel who make and review parent-child contact decisions.  At trial, the parties may develop the evidentiary record regarding the fiscal or administrative burdens of adding or substituting a neutral decisionmaker at some point in the process.

### Conclusion

Plaintiffs' summary judgment motion is denied.  IDOC's summary judgment motion is granted as to the requirements (1) that chaperones and guardians do not deny or refute, or allow parolees to deny or refute, the details of their convictions and (2) that parolees regularly attend therapy.  IDOC's motion is otherwise denied.  This case will proceed to a bench trial on the surviving class claims.

September 30, 2021

_____
United States District Judge