UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CELINA MONTOYA, ZACHARY BLAYE, and RONALD MOLINA, individually and on behalf of all others similarly situated, | ) ) ) ) | 18 C 1991 |
| Plaintiffs, | ) ) | Judge Gary Feinerman |
| vs. | ) ) ) | |
| ROB JEFFREYS, in his official capacity as Director of the Illinois Department of Corrections, | ) ) ) ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Celina Montoya, Zachary Blaye, and Ronald Molina, who all were placed on mandatory

supervised release ("MSR") following imprisonment for Illinois sex offense convictions, bring

this suit under 42 U.S.C. § 1983 against Rob Jeffreys in his official capacity as Director of the

Illinois Department of Corrections ("IDOC"), alleging that IDOC's implementation of an MSR

condition prohibiting them from having contact with their minor children without prior approval

violated their Fourteenth Amendment due process rights.  Doc. 92.  The court has entered a

preliminary injunction, Doc. 33; certified a Civil Rule 23(b)(2) class as to certain claims,

Doc. 165-166 (reported at 2020 WL 6581648 (N.D. Ill. Nov. 10, 2020)); and granted IDOC

summary judgment as to some of the class claims.  Docs. 221-222 (reported at 565 F. Supp. 3d

1045 (N.D. Ill. 2021)).  The court then held a bench trial on the surviving class claims.

Docs. 249-252.

Pursuant to Civil Rule 52(a), the court enters the following Findings of Fact and

Conclusions of Law.  The Findings of Fact rest on the court's evaluation of the exhibits and

witness testimony; unless otherwise noted, if the court cites witness testimony to support a

factual finding, the court found that testimony credible. To the extent any Findings of Fact may be considered Conclusions of Law, they shall be deemed Conclusions of Law, and vice versa. After carefully considering the evidence and assessing the witnesses' credibility, the court finds that Plaintiffs have shown that: (1) IDOC unconstitutionally prohibits written contact between class members and their minor children upon their release from prison and placement on MSR; and (2) in certain circumstances, IDOC unconstitutionally conditions parent-child contact on a class member's ability to afford a polygraph examination. The court declares unconstitutional those two aspects of IDOC's policies. In all other respects, the court finds that Plaintiffs fail to show that IDOC's policies violate due process.

## Findings of Fact

### A. The Parties and Witnesses

1. Zachary Blaye is a class representative who, while on MSR, did not have permission to have any in-person contact with his minor son until January 2020. 565 F. Supp. 3d at 1058.

2. Ronald Molina is a class representative who, while on MSR, was prohibited from having contact with his son until his son turned eighteen years old. *Ibid.*; Tr. 157:19-158:14, 166:11-166:15 (DeMauro testimony).

3. Celina Montoya is a class member who has been permitted to live at her family home with her children since August 2019. 565 F. Supp. 3d at 1058.

4. Joel Mitchell is a former class member who completed his MSR term in August 2021. Tr. 506:22-504:25, 507:13-507:17 (J. Mitchell testimony).

5. Rachel Mitchell is Joel Mitchell's wife and the mother of their children. Tr. 535:21-535:25, 538:18-539:3 (R. Mitchell testimony).

6.      Blaye and Molina represent a certified class comprising "all parents of minor children who are on MSR for a sex offense under IDOC supervision."  2020 WL 6581648, at *15-16.

7.      Defendant Rob Jeffreys is IDOC's Director.  Doc. 147 at ¶ 6.

8.      Sarah Brown-Foiles is IDOC's Manager of Sex Offender Services, a position formerly called Coordinator of Sex Offender Services.  Tr. 293:24-294:13 (Brown-Foiles testimony).

9.      IDOC currently employs four sex offender therapists who see persons on MSR, and it has plans to hire five more.  Tr. 307:22-307:25, 359:9-359:19 (Brown-Foiles testimony).

10.      Brown-Foiles supervises the IDOC-employed sex offender therapists, including Dr. Patricia Grosskopf.  Tr. 400:19-400:22, 598:23-598:24 (Brown-Foiles testimony; Grosskopf testimony).

11.      Brown-Foiles also supervises clinicians working towards licensure as sex offender therapists in Aurora, Illinois.  Tr. 401:1-401:22 (Brown-Foiles testimony).

12.      Brown-Foiles coordinates training for sex offender therapists who are not employed by IDOC; those therapists are called "community therapists."  Tr. 296:5-296:8, 341:7-341:22, 365:10-365:18, 376:24-377:23 (Brown-Foiles testimony).

13.      Dr. Jerry Blain and Dr. Eleanor Harris are community therapists. Tr. 200:1-200:17 (Blain testimony; Brown-Foiles testimony); Harris Dep. (Doc. 255-2 at 3 (6:3-7:11)).

14.      Dr. Peter Eisenmenger is a licensed sex offender therapist and sex offender evaluator employed by Wexford Health Sources.  Eisenmenger Dep. (Doc. 255-1 at 4-5 (11:25-14:12).

3

15.     Steven DeYoung is a parole commander employed by IDOC.  He formerly was a parole agent with IDOC's Sex Offender Supervision Unit ("SOSU").  Tr. 20:13-21:5 (DeYoung testimony).

16.     Joseph DeMauro is an IDOC parole agent assigned to the SOSU. Tr. 134:5-134:18 (DeMauro testimony).

### B.     Mandatory Supervised Release

17.     Individuals convicted of certain offenses are subject a form of parole called mandatory supervised release ("MSR") following their release from prison.  Joint Exh. 1 at 22. For simplicity, the court also refers to MSR as "parole" and persons released on MSR as "parolees."

18.     The Illinois Prisoner Review Board imposes MSR conditions on parolees pursuant to 730 ILCS 5/3-3-7.  Doc. 244 at p. 6, ¶ 1.

19.     The Prisoner Review Board ordinarily imposes on parolees convicted of sex offenses an MSR condition requiring them to "refrain from all contact, directly or indirectly, personally, by telephone, letter, or through a third party, with minor children without prior identification and approval of an agent of the [IDOC]."  Doc. 244 at p. 6, ¶ 2; *see* 730 ILCS 5/3-3-7(b-1)(9).  For simplicity, the court refers to that requirement as the "no-contact condition."

20.     IDOC enforces the no-contact condition and determines the standards, criteria, and process for a parolee to obtain approval to have contact with a minor child.  Doc. 244 at pp. 6-7, ¶¶ 3, 15.

21.     The SOSU supervises parolees convicted of sex offenses.  Doc. 244 at p. 7, ¶ 14; Joint Exh. 1.

22.     A small percentage of parolees convicted of sex offenses request contact with their minor children.  Tr. 35:23-36:7, 250:22-251:11, 600:8-600:13, 627:24-628:3 (DeYoung testimony; Blain testimony; Grosskopf testimony).

23.     IDOC provides such parolees with an information packet about the parent-child contact policy, including the process for submitting child-contact requests and appeals.  Doc. 244 at p. 7, ¶ 16.; Joint Exh. 2.

24.     Persons with determinate MSR terms may remain in prison for a statutorily mandated length of time rather than serve their MSR terms in a community setting.  That practice is known as "maxing out."  Doc. 244 at p. 6, ¶ 4.

25.     Some individuals convicted of sex offenses who are eligible for MSR choose to "max out" their MSR terms.  Tr. 356:11-356:21, 529:5-530:14 (Brown-Foiles testimony; J. Mitchell testimony).

26.     Sex offenders who are in prison can have contact with their minor children. Phone calls are monitored and recorded; non-attorney written correspondence is reviewed; and in-person visitation is supervised IDOC correctional officers.  Tr. 83:10-84:6 (DeYoung testimony).

27.     "Maxing out" thus allows some individuals whose child-contact requests have been or would be denied while on MSR to resume or continue written, telephone, and/or in-person contact with their minor children.  Tr. 102:21-103:3, 529:22-530:4 (Tyree testimony; J. Mitchell testimony).

### C.     Pre-Release Procedures

28.     As relevant here, IDOC has two processes for assessing individuals convicted of sex offenses prior to their release on MSR: (a) pre-release evaluations; and (b) Sexually Violent

Persons Commitment Act ("SVPCA") screening.  Tr. 318:12-322:4, 378:12-386:14 (Brown-Foiles testimony).

### 1. Pre-Release Evaluation

29.     Illinois law requires that a person convicted of a sex offense "receive a sex offender evaluation" prior to release from prison.  Doc. 244 at p. 30-31, ¶ 9; *see* 730 ILCS 5/3-6-2(j).

30.     IDOC refers to those evaluations as "pre-release evaluations."  Tr. 378:15-378:22 (Brown-Foiles testimony).

31.     Pre-release evaluations occur six to twelve months before an individual's release from prison.  Tr. 379:4 (Brown-Foiles testimony).

32.     Pre-release evaluations necessarily lack information the evaluator could use to assess a parolee's stability in the community, relationship stability, employment, cooperation with supervision, and ability to adapt to stressors outside the prison environment. Tr. 392:16-392:19, 393:5-393:9, 575:19-575:23, 592:3-594:16 (Brown-Foiles testimony; Grosskopf testimony); Eisenmenger Dep. (Doc. 255-1 at 21-22 (81:11-82:5)).

33.     As a result, risk assessments conducted while a parolee is in the community are more accurate than assessments conducted prior to release.  Tr. 392:10-392:19 (Brown-Foiles testimony).

34.     IDOC's pre-release evaluations currently do not include any actuarial risk assessments.  Tr. 381:21-381:22 (Brown-Foiles testimony).

35.     Actuarial risk assessments, such as the STATIC-99 and STABLE, are not validated for use with prisoners.  Tr. 613:1-613:5 (Grosskopf testimony).

36.     Despite the lack of validation, IDOC uses the STATIC and STABLE assessments with prisoners seeking to enroll in sex offender therapy while incarcerated.  Tr. 332:22-332:25 (Brown-Foiles testimony).

37.     Because the STABLE and STATIC actuarial risk assessments are not validated for use with incarcerated persons, they would not necessarily produce accurate results if used before a prisoner's release.  Tr. 612:18-613:5, 633:12-633:21 (Grosskopf testimony).

38.     In particular, the STABLE assessment is designed for use with non-incarcerated persons because it incorporates information from a person's life in the community that cannot be assessed while a person is incarcerated.  Tr. 391:5-392:3 (Brown-Foiles testimony).

39.     Accordingly, even if IDOC sometimes performs STABLE assessments for prisoners, it will repeat that assessment after a prisoner's release so that it can consider the risk factors that cannot be captured by an assessment performed in a prison.  Tr. 391:15-391:18 (Brown-Foiles testimony).

40.     Prisoners who receive sex offender therapy while incarcerated are reassessed after release because the assessed risk can change for reasons such as increased access to victims, access to addictive substances, and inability to reintegrate into community life. Tr. 373:23-374:19 (Brown-Foiles testimony).

41.     The Abel assessment is a treatment tool that is not capable of rendering results that would inform child-contact decisions.  Tr. 629:24-632:16 (Grosskopf testimony).

42.     The Risk of Sexual Abuse to Children ("ROSAC") framework is not an actuarial risk assessment.  Rather, it is designed to structure a treatment provider's professional judgment. Tr. 340:5-340:15, 580:22-581:12, 632:21-633:5 (Grosskopf testimony; Brown-Foiles testimony); Pl. Exh. 1 at 10.

43.     ROSAC assessments are not designed to be used with prisoners because some factors relate to a parolee's circumstances in the community.  Tr. 276:24-277:7, 633:6-633:8, 636:2-636:12 (Blain testimony; Grosskopf testimony).

44.     Although it is not impossible to use ROSAC with prisoners, the framework may produce less accurate results because it has not been "normed" for incarcerated populations, which increases the margin of error.  Tr. 343:3-343:5, 636:13-637:6 (Brown-Foiles testimony; Grosskopf testimony).

45.     Pre-release evaluations are based on voluntarily self-reported information, which is not corroborated and can contain inaccuracies.  Tr. 316:9-317:5, 318:25-319:9, 337:9-337:15, 379:23-381:2 (Brown-Foiles testimony).

46.     Information about a prisoner gathered in the pre-release evaluation may change once the prisoner is released as a parolee into the community.  Tr. 627:14-627:23 (Grosskopf testimony).

47.     Given the limits of pre-release evaluations, the most accurate risk assessments are performed while a parolee is living in the community.  Tr. 392:10-392:13, 627:6-627:19, 636:6-636:12 (Brown-Foiles testimony; Grosskopf testimony).

48.     There is no evaluation or combination of pre-release evaluations that can be as accurate as post-release evaluations.  Tr. 392:4-392:8 (Brown-Foiles testimony).

## 2.  SVPCA Screening

49.     The SVPCA, 725 ILCS 207/1 *et seq*., creates a procedure under which the Attorney General of Illinois or the relevant county's State's Attorney may petition for civil commitment of certain individuals convicted of sex offenses upon their release from prison.  565 F. Supp. 3d at 1053.

50. To facilitate this process, the SVPCA requires IDOC to conduct a "comprehensive evaluation of the person's mental condition." 725 ILCS 207/10(c)(2).

51. An evaluator conducting a first-level SVPCA screening will review the pre-release evaluation report and other documents in the prisoner's master file to determine whether the prisoner should be referred for a second, more comprehensive evaluation conducted by a sex offender evaluator, who is a Ph.D. psychologist. Tr. 320:14-321:2 (Brown-Foiles testimony).

52. A first-level SVPCA screening does not include an interview with the prisoner. Tr. 383:22-383:24 (Brown-Foiles testimony).

53. A second-level SVPCA screening includes an interview and actuarial risk assessments, including the STATIC assessment. Tr. 384:18-384:22 (Brown-Foiles testimony).

54. A second-level evaluation ordinarily takes three to four weeks to complete. Tr. 384:23-384:25 (Brown-Foiles testimony).

55. Because the threshold for civil commitment is high, a person could have an above-average recidivism risk and still not be referred for civil commitment through the SVPCA screening process. Tr. 386:4-386:14 (Brown-Foiles testimony).

### D. Post-Release Evaluation

56. IDOC convenes "containment teams" to evaluate parolees' child-contact requests. Tr. 428:8-428:10 (Dixon testimony); Joint Exh. 1.

57. A parolee's containment team comprises the parolee's assigned parole agent, the parole agent's commander, and a sex offender therapist. Tr. 428:11-428:14 (Dixon testimony).

58. IDOC policy requires that a containment team make an initial determination on child contact within 21 days of a parolee's request for child contact. Tr. 442:14-442:18 (Dixon testimony; DeMauro testimony); Joint Exh. 1 at 9.

9

59.     IDOC policy does not establish a different timeline for requests seeking contact only via written communications.  Joint Exh. 1 at 9.

60.     DeYoung testified that he would not have time to review written communications that parolees would like to send to their minor children.  Tr. 57:11-57:20 (DeYoung testimony).  As explained below, the court finds that testimony unpersuasive.

61.     If the containment team restricts or denies parent-child contact, the team must provide the parolee with written reason(s) for the decision.  Joint Exh. 1 at 10; Joint Exh. 2 at 4.

62.     An IDOC form titled "Parolee/Releasee Determination of Request for Contact with Child(ren)" lists standard reasons for denial, including "Insufficient therapy sessions to make assessment" and "Therapist requested polygraph but results are not available."  Joint Exh. 2 at 4.

63.     If the containment team approves child contact, the containment team and parolee develop a "safety plan" setting forth requirements or guidelines for child contact.  Joint Exh. 1 at 10; Joint Exh. 2 at 6-8; Tr. 568:9-568:14 (Grosskopf testimony).

64.     The form safety plan has a "requirement[]" that "[t]he parolee has successfully completed and passed a sexual history OR maintenance polygraph."  Joint Exh. 2 at 6.

65.     IDOC policy, however, does not require a parolee to take a polygraph examination prior to parent-child contact, so the safety plan "requirement" applies only when a therapist requests a polygraphs.  Tr. 452:17-453:3 (Dixon testimony).

66.     In evaluating child-contact requests, the containment team may consider compliance and stability in the community, such as whether the parolee has stable housing, has a stable job, and attends school or other training.  Tr. 469:6-469:20, 471:16-472:23, 575:19-575:23, 589:1-589:5 (Dixon testimony; Grosskopf testimony).

10

### 1. Polygraph Examinations

67.     IDOC permits therapists to exercise their discretion in deciding whether to withhold a recommendation for parent-child contact until a parolee takes and passes a polygraph examination.  Tr. 462:9-462:13, 486:22-487:2 (Dixon testimony).

68.     Some, but not all, sex offender therapists require parolees to take one or more polygraph examinations prior to the therapist recommending parent-child contact. Tr. 453:4-453:9 (Dixon testimony).

69.     Regardless of their financial situation, parolees must pay for their own polygraph examinations without any financial assistance from IDOC.  Doc. 244 at p. 6, ¶ 8; Tr. 164:18-164:24, 241:10-241:22, 310:3-310:10, 497:12-497:15 (DeMauro testimony; Blain testimony; Brown-Foiles testimony; Dixon testimony).

70.     Polygraph examinations typically cost parolees between $200 and $400. Doc. 244 at p. 6, ¶ 7; Tr. 242:5-242:7, 309:22-310:2 (Blain testimony; Brown-Foiles testimony).

71.     Of the sex offender therapists who require a polygraph examination, some do not make exceptions for parolees who cannot afford to pay the fee.  Tr. 241:23-242:4, 246:24-247:2 (Blain testimony).

72.     Some private polygraph examiners, at their discretion, offer discounts or payment plans to parolees.  Tr. 242:8-243:1 (Blain testimony).

73.     IDOC offers no process or mechanism by which a parolee can take a polygraph examination if the parolee is unable to afford it.  Tr. 310:8-310:10, 497:16-497:19 (Brown-Foiles testimony; Dixon testimony).

74.     Ability to pay for a polygraph has no connection to the risk of harm presented by parolee-child contact.  Tr. 165:9-165:12 (DeMauro testimony).

75.     Still, Dr. Blain considers the ability to pay for a polygraph when assessing a parolee's risk profile.  Tr. 269:1-269:9, 284:8-248:11 (Blain testimony).

76.     In November 2019, Dr. Blain withheld his support for Molina's child-contact request because Molina had not taken a polygraph examination.  Tr. 166:3-166:24, 254:7-257:14, 258:14-258:23 (DeMauro testimony; Blain testimony).

77.     At that time, Molina could not afford to pay for a polygraph examination. Tr. 166:8-166:15 (DeMauro testimony).

78.     Approximately half of parolees do not have the financial resources to pay for a therapist upon release, Tr. 46:22-47:4 (DeYoung testimony), which strongly suggests they also lack the funds to pay for a polygraph.

## 2.  Duration of Therapy

79.     Some providers, such as Dr. Grosskopf, do not set a lower bound for how long a parolee must be enrolled in therapy before parent-child contact will be approved. Tr. 582:19-583:14, 589:16-589:23 (Grosskopf testimony).

80.     Other providers have a general timeline for how long a parolee must enroll in therapy, such as six months to a year, for them to make an informed recommendation regarding parent-child contact.  Tr. 236:24-237:5 (Blain testimony).

81.     Other providers set a lower bound for duration in therapy, but still exercise professional discretion to make individualized assessments.  Harris Dep. (Doc. 255-2 at 13-14 (48:21-49:20; 50:14-50:21)).

82.     IDOC policy does not cap the length of time, whether measured in weeks or number of therapy sessions, a provider can take to be able to make a child-contact recommendation.  Tr. 350:11-350:25 (Brown-Foiles testimony).

83.    A parolee who believes that a therapist has taken too long to make a parent-child contact recommendation can seek input from an IDOC-employed therapist, contact Brown-Foiles, or file a formal appeal.  Tr. 394:22-395:7 (Brown-Foiles testimony).

84.    A parole agent can also refer a parolee to another provider, such as Dr. Grosskopf, to expedite the decisional process.  Tr. 47:7-48:12, 359:20-360:3 (DeYoung testimony; Brown-Foiles testimony).

85.    Although Dr. Grosskopf's IDOC office in Chicago currently has a waiting list for new clients, she historically has made exceptions that allow her to see on an expedited basis parolees requesting child contact.  Tr. 54:3-54:6, 585:8-586:6 (DeYoung testimony; Grosskopf testimony).

### 3.  Compliance with Parole Conditions

86.    Compliance with parole conditions is one factor the containment team uses to decide whether to approve parent-child contact requests.  Tr. 471:13-473:23, 573:2-575:14 (Dixon testimony; Grosskopf testimony).

87.    IDOC does not automatically deny parent-child contact requests if the parolee has a certain number of parole violations.  Tr. 452:11-452:16 (Dixon testimony).

88.    In evaluating this criterion, IDOC considers a parole violation's seriousness, and minor parole violations do not result in the denial of parent-child contact.  Tr. 78:23-79:6, 451:10-451:19, 477:14 (DeYoung testimony; Dixon testimony).

89.    "Minor" parole violations include, for example, returning home late, leaving early for work, and failing to check in as instructed.  Tr. 451:19-451:25, 574:20-575:4 (Dixon testimony; Grosskopf testimony).

90.    More serious parole violations include patterns of repeated violations, using alcohol and/or drugs, not being responsive to a parole agent, and sexual offenses (such as

13

possessing an unauthorized cell phone containing pornographic images).  Tr. 79:8-79:13,
172:17-172:25, 452:2-452:10, 574:9-575:10 (DeYoung testimony; DeMauro testimony; Dixon
testimony; Grosskopf testimony).

### E.    Administrative Appeals Process

91.    If the containment team denies a child-contact request, the containment team
reviews that decision every 28 days.  Tr. 443:3-443:14 (Dixon testimony).

92.    A parolee whose child-contact request is denied may also file an administrative
appeal.  Tr. 398:16-398:19 (Brown-Foiles testimony); Joint Exh. 1.

93.    Appeals are decided by the Deputy Chief of Parole or a designee.  Joint Exh. 1.

94.    Brown-Foiles is the Deputy Chief of Parole's designee and ordinarily decides
appeals.  Doc. 244 at p. 7, ¶ 17; Tr. 399:1-399:2, 447:7-447:14, 448:6-448:23 (Brown-Foiles
testimony; Dixon testimony).

95.    In deciding appeals, Brown-Foiles reviews the parolee's records, risk evaluations,
and treatment documents.  She also sometimes speaks directly with the parolee.
Tr. 400:12-400:18 (Brown-Foiles testimony).

96.    As of April 29, 2022, no appeal from a child-contact decision has involved an
IDOC-employed or community therapist supervised by Brown-Foiles.  Tr. 402:1-402:13
(Brown-Foiles testimony).

97.    If such an appeal were filed, Brown-Foiles would not decide the appeal.
Tr. 403:1-403:3 (Brown-Foiles testimony).

98.    Brown-Foiles would not participate in any appeal from an initial child-contact
decision in which she participated or offered advice.  Tr. 413:13-413:21 (Brown-Foiles
testimony).

99.     Instead, such appeals would be forwarded to Alyssa Williams or Heather Wright. Tr. 403:5-403:8, 413:22-414:1 (Brown-Foiles testimony).

100.     Williams is the IDOC Chief of Programs and, in that capacity, supervises Brown-Foiles.  Tr. 403:9-403:12, 414:5-414:6 (Brown-Foiles testimony).

101.     Wright is the Clinical Director at Big Muddy River Correctional Center and, in that capacity, oversees sex offender treatment provided there.  Tr. 403:19-404:2 (Brown-Foiles testimony).

102.     Wright does not participate in, and does not supervise anyone who participates in, initial child-contact determinations.  Tr. 404:3-404:9 (Brown-Foiles testimony).

103.     IDOC policy requires appeals to be decided in writing within 21 days of submission.  Joint Exh. 1.

## Conclusions of Law

The court certified four questions to be tried as a class action: "(1) whether the IDOC policy's presumptive 35-day ban on parent-child contact violates procedural due process; (2) whether the  presumptive 35-day ban violates substantive due process; (3) whether certain criteria IDOC uses to make parent-child contact determinations violate substantive due process; and (4) whether the lack of a neutral decisionmaker violates procedural due process."  2020 WL 6581648, at *16.  As to the third question, Plaintiffs challenged five criteria: "(1) not having taken a polygraph[;] (2) insufficient duration of therapy; (3) denial of the parolee's guilt by the parolee or the child's custodial parent; (4) noncompliance with conditions of parole; and (5) unreliable attendance at therapy."  565 F. Supp. 3d at 1059.  The court granted IDOC summary judgment as to two of those criteria: denial of guilt (as limited to a restriction on what the child's guardian or the chaperone of an in-person visit may do and say) and unreliable

15

attendance at therapy (as used to capture attendance, engagement, and participation). *Id*. at 1072-74. The remaining claims proceeded to trial. (The case remains a proper class action even if the two class representatives' claims became moot after the class was certified. *See Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) ("[A] class action is not rendered moot when the named plaintiff's individual claim becomes moot *after* the class has been duly certified.").)

As the court held, the standard articulated in *Turner v. Safley*, 482 U.S. 78 (1987), governs Plaintiffs' substantive due process claims. 565 F. Supp. 3d at 1060-63. *Turner* arose in the prison context, but the Seventh Circuit has held that it applies with equal force in the parole context. *Id*. at 1062 (citing *Felce v. Fiedler*, 974 F.2d 1484 (7th Cir. 1992)). As relevant here:

> *Turner* holds that "federal courts must take cognizance of the valid constitutional claims of prison inmates," but that courts must "accord deference to the appropriate prison authorities." 482 U.S. at 84-85. To accommodate those competing concerns, *Turner* articulates "a standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial restraint regarding prisoner complaints and to the need to protect constitutional rights." *Id*. at 85 (internal quotation marks and alteration omitted). The four-factor test considers: "[1] whether the [prison] regulation has a 'valid, rational connection' to a legitimate governmental interest; [2] whether alternative means are open to inmates to exercise the asserted right; [3] what impact an accommodation of the right would have on guards and inmates and prison resources; and [4] whether there are 'ready alternatives' to the regulation." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (quoting *Turner*, 482 U.S. at 89-91). "*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Id*. at 136.

> "The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts." *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010); *see also Van den Bosch v. Raemisch*, 658 F.3d 778, 785 n.6 (7th Cir. 2011) ("Though each of the factors is relevant in assessing the reasonableness of a regulation, we have previously observed that the first factor serves as a threshold, and the district court need not explicitly articulate its consideration of each one.") (internal quotation marks omitted).

…

> Under *Turner*, "[t]he burden ... is not on the State to prove the validity of
> prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at
> 132; *see also Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007) ("When
> challenging the reasonableness of the prison's regulation, the inmate bears the
> burden of persuasion."). Even so, "prison officials must still articulate their
> legitimate governmental interest in the regulation and provide some evidence
> supporting their concern." *Riker v. Lemmon*, 798 F.3d 546, 553 (7th Cir.
> 2015) (internal quotation marks omitted).

565 F. Supp. 3d at 1061 (alterations and second omission in original). By contrast, the familiar

three-part balancing test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), governs

Plaintiffs' procedural due process claims. 565 F. Supp. 3d at 1063 (explaining that, although

*Turner* governs the scope of the affected private interest, it "does not displace *Mathews* as the

overarching framework for the procedural due process analysis").

## A.     No-Contact Condition

Parolees subject to the no-contact condition are presumptively banned from contact with

their minor children. Doc. 244 at p. 30, ¶ 7; 565 F. Supp. 3d at 1052-53. Plaintiffs challenge the

presumptive ban as a violation of both substantive and procedural due process.

### 1.  Substantive Due Process

As the court held, the no-contact condition burdens parolees' constitutional right to

familial association. 565 F. Supp. 3d at 1064. Under *Turner*, the policy's constitutionality

depends on "whether Plaintiffs can identify an 'obvious regulatory alternative that fully

accommodates the asserted right while not imposing more than a *de minimis* cost' to IDOC's

'valid penological goal[s].'" *Id*. at 1065 (alteration in original) (quoting *Overton*, 539 U.S. at

136). The same standard applies even where the policy adversely affects the rights of a custodial

parent who is not on parole. *See Nigl v. Litscher*, 940 F.3d 329, 334 & n.2 (7th Cir. 2019)

(noting that *Turner* applies when a lawsuit challenges prison regulations, "whether the rights of

prisoners or of nonprisoners are at stake") (quoting *Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995)).

Plaintiffs propose that IDOC could "rely on a sex offender evaluation to consider whether a parent may have [in-person] contact with and/or reside in a home with his or her child prior to the parent's release from custody," arguing that the proposal is feasible because IDOC "already conducts a sex offender evaluation on every person being released from IDOC who has been convicted of a sex offense as required by law." Doc. 262 at 10. Based on the court's findings of fact, and insofar as in-person parent-child contact is concerned, Plaintiffs' proposed alternative is inadequate because it imposes more than a *de minimis* cost on IDOC's valid penological goals. Importantly, the pre-release evaluations that IDOC already conducts, though called "sex offender evaluations" under Illinois law, are different from the post-release "sex offender evaluations" conducted on parolees after their release. As Brown-Foiles and Dr. Grosskopf testified, the pre-release evaluations materially differ in that they lack actuarial risk assessments and do not render an accurate risk level.

IDOC could not reasonably adopt Plaintiffs' proposed alternative at no more than *de minimis* cost to its valid penological interests. The problem is not that pre-release assessments could not be administered, as IDOC already uses assessments in sex offender therapy programs offered in prisons and during the second-level SVPCA screening process. Rather, the severe burden on IDOC's penological interests arises from the inaccuracy of those pre-release assessments.

As Brown-Foiles explained, the "most accurate risk assessment" comes from using the "best information" about a parolee's transition to community life, which is necessarily unavailable in a pre-release context. As a result, Brown-Foiles persuasively concluded that there

is no assessment or combination of assessments that could provide an adequate substitute for post-release evaluation by a sex offender therapist. Similarly, Dr. Grosskopf explained that, given the differences between prison life and community life, an accurate assessment requires some post-release evidence regarding the parolee's transition to and stability in the community. In other words, even if IDOC could incorporate actuarial risk assessments into pre-release evaluations, those assessments still would lack the most probative information about the risk of harm to parolees' children from parent-child contact. That necessarily imposes a severe burden on IDOC's interest in ensuring child safety.

Resisting that conclusion, Plaintiffs suggest that if IDOC's pre-release evaluations are not true "sex offender evaluations," then they violate Illinois law requiring IDOC to conduct "sex offender evaluation[s]," 730 ILCS 5/3-6-2(j), before a parolee's release. Doc. 262 at 11. That argument is unpersuasive, as whether IDOC's pre-release evaluations conform to the state law meaning of "sex offender evaluation[s]" has no bearing on Plaintiffs' federal due process claims. *See Wozniak v. Adesida*, 932 F.3d 1008, 1011 (7th Cir. 2019) ("The meaning of the Due Process Clause is a matter of federal law, and a constitutional suit is not a way to enforce state law through the back door.").

Plaintiffs further argue that "IDOC's presumptive ban on parent-child contact upon release often has a profoundly destabilizing effect on" parolee parents and thereby "undermines the very interests it seeks to promote." Doc. 262 at 15. Some evidence supports Plaintiffs' view: the financial and emotional stresses of living apart from their children can undermine parolees' rehabilitation and reintegration into the community, and some parolees choose to "max out" their MSR term in prison so as to maintain contact with their children. But those facts do not render IDOC's policy arbitrary or irrational, as IDOC has a strong interest in assessing parolees'

19

stability and reintegration into the community before allowing child contact.  Ultimately, the court owes deference to IDOC officials' judgments regarding the proper balance between its rehabilitative and safety goals.  *See Overton*, 539 U.S. at 132 ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."); *Toston v. Thurmer*, 689 F.3d 828, 830-31 (7th Cir. 2012) (deferring to prison administrators' safety rationale even though their justification was "not ample").  Against that deferential backdrop, Plaintiffs have failed to satisfy their burden under *Turner* to disprove the validity of IDOC's policy.

Plaintiffs also suggest that the no-contact condition is overbroad insofar as IDOC could exempt remote contact—such as phone calls and letters—without any risk of harm.  Doc. 262 at 7-8.  Thus, according to Plaintiffs, remote contact is another ready alternative that would accommodate their parental rights without threatening IDOC's valid safety concerns.  *Ibid*.

Allowing phone calls would require safeguards imposing a greater than *de minimis* burden on IDOC.  Although a child could not be physically harmed by phone contact, other predatory behaviors are possible.  If IDOC allowed phone contact, it would need to record or monitor the calls and, potentially, intervene instantaneously to protect child safety.  That would, at a minimum, pose a substantial administrative burden.  It is true, as Plaintiffs note, that IDOC allows parent-child calls from prison.  But no record evidence suggests that IDOC could recreate at *de minimis* cost the existing infrastructure used to record or monitor prison phone calls.  Under *Turner*, IDOC's policy survives insofar as it governs phone calls.

By contrast, IDOC's safety justification for banning written communication does not pass muster.  Of course, as with phone calls, some written communications could contain harmful

20

content. But written communications need not be regulated and reviewed in real time: a parolee could submit a proposed written communication to a parole agent for prior review and approval. The amount of time it would take IDOC to review written communications like a letter or a birthday card would be *de minimis*. Reviewing such writings would require no more than a few moments. DeYoung's testimony that he does not have time as a parole agent or parole commander to review written communications is not persuasive and, even if it were, IDOC easily could provide an alternative process, such as review by the parolee's therapist.

Plaintiffs have therefore met their burden to show that IDOC's ban on parent-child contact is unconstitutional insofar as it fails to provide parolees an opportunity for written parent-child contact before other forms of contact are permitted. The policy is declared unconstitutional, as follows: IDOC must provide a parolee not otherwise approved for parent-child contact the opportunity to submit proposed written communications for approval. Within seven days of submission, IDOC shall approve or disapprove the communication. If the communication is disapproved, IDOC must briefly give the reasons for the disapproval in writing, and the parolee may seek administrative review through the existing appeal process. Disapproval shall be without prejudice to the parolee's submitting a revised version of the written communication that addresses IDOC's concerns.

Finally, the court notes that the denial of parent-child contact for reasons unrelated to child safety would raise grave constitutional concerns. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) ("The fundamental right to familial relations is an aspect of substantive due process. … This right is not absolute, but must be balanced against the state's interest in protecting children from abuse. To achieve the proper balance, caseworkers must have some definite and articulable evidence giving rise to a reasonable suspicion of past or

imminent danger of abuse before they may take a child into protective custody.") (internal quotation marks omitted).  Consistent with that principle, IDOC policy does *not* permit containment team members to withhold child contact for non-safety-related reasons.  Dr. Blain's testimony, which suggested he could withhold child-contact approval to incentivize parolees to comply with other aspects of their therapy, appears to be an aberrant misunderstanding of the policy, which IDOC repudiated at closing argument.  Doc. 267.  The court expects that IDOC, consistent with its representations regarding its policy's proper implementation, will ensure that containment team members understand the permissible bases for limiting or denying child contact.  And, consistent with the policy, a parolee whose contact request has been denied for a potentially invalid reason can file an administrative appeal.

## 2.  Procedural Due Process

Plaintiffs' procedural due process claim challenges both the lack of a pre-deprivation hearing and, if a post-deprivation hearing suffices, the promptness of such a hearing.  565 F. Supp. 3d at 1066.  As noted, the three-factor *Mathews* balancing test governs the claim.  *Id*. at 1063.  That test considers: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.

### a.  Pre-Deprivation Hearings

Weighing the *Mathews* factors, pre-deprivation hearings are not required.  As the court held in its summary judgment opinion, the first factor—a parolee's liberty interest in familial association—weighs in Plaintiffs' favor.  565 F. Supp. 3d at 1067 ("No matter the outcome of a

post-deprivation hearing, parolees can never reclaim the time they have been separated from their children during the no-contact period following their release.  The first *Mathews* factor therefore weighs in favor of pre-deprivation hearings.").  Trial testimony that some parolees elect to "max out" their MSR in prison rather than give up contact with their children underscores the substantial weight of that liberty interest.  The evidence adduced at trial, however, shows that the other two factors outweigh Plaintiffs' liberty interest.

"The second *Mathews* factor considers 'the risk of an erroneous deprivation of [the affected] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'"  *Ibid*. (quoting 424 U.S. at 335).  Without pre-deprivation hearings, class members face a substantial risk of an erroneous deprivation because they are not allowed to pursue a pre-release process for receiving an individualized child-contact decision based on the risk of harm to the child.  *Ibid*.  But, as explained above, Plaintiffs' proposed alternative process would adversely affect the accuracy of IDOC's risk evaluation regarding child-contact requests.  Pre-deprivation evaluations lack certain features, including actuarial assessments, that diminish their reliability.  And even if it were feasible for IDOC to add actuarial assessments to its pre-release evaluations, such evaluations still would lack key inputs about parolees' adjustment to life in the community and ability to handle stress outside prison.

The third *Mathews* factor likewise weighs heavily in IDOC's favor.  As the court held in its summary judgment opinion, IDOC has a legitimate interest in making "'an accurate and just decision'" as to whether parolee-child contact "pose[s] risks to the child's health and safety." 565 F. Supp. 3d at 1068 (quoting *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981)).  As noted, the court credits Brown-Foiles's and Dr. Grosskopf's testimony that pre-release evaluations are inherently less accurate and reliable than post-release evaluations

because the former lack critical information about how a parolee will adjust to life in the community after release. Post-release evaluations thus serve IDOC's weighty interests in promoting child safety.

Plaintiffs argue that "testimony about the shortcomings of the pre-release evaluations conducted within IDOC was contradicted by Dr. Peter Eisenmenger." Doc. 262 at 11. Dr. Eisenmenger testified that, in certain circumstances, he would feel comfortable making child-contact recommendations based on pre-release evaluations. Doc. 255-1 at 14-15 (53:25-56:3). But he later agreed that, in evaluating the permissibility of visitation or living with a child, it would be "more appropriate" to conduct post-release evaluations, essentially for the reasons stated by Brown-Foiles and Dr. Grosskopf. *Id*. at 21-22 (81:13-82:11); *see also id*. at 12 (42:5-43:4) (testifying that, before making a recommendation about parolee-child contact, he would want "to know what [the parolee's] functioning is going to be in the community for a while because they can—there's treatment in the facility, which is under a—under a very controlled environment, but what happens in the community could be something completely different than what they're presenting in the facility itself. So someone could be saying all the right things and acting the right way in the facility, but then when they get out in the community, it could be a completely different type of situation," and that he would want to see how a parolee functioned in the community for "at least six months"). In any event, even if Dr. Eisenmenger's testimony conflicted with that of Brown-Foiles and Dr. Grosskopf, the court would credit Brown-Foiles and Dr. Grosskopf's opinions based on the depth of their experience, the clarity and cogency of their testimony, and their demeanor while testifying.

### b. Prompt Post-Deprivation Hearings

IDOC's policy satisfies procedural due process by providing for sufficiently prompt post-deprivation hearings that yield an initial decision within twenty-one days of a parolee's

child-contact request. "Due process requires that post-deprivation determinations be 'sufficiently prompt.'" 565 F. Supp. 3d at 1068 (quoting *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 618 (7th Cir. 2002)). "The degree of promptness required is determined by balancing 'the importance of the private interest and the harm to the interest occasioned by the delay; the justification offered by the Government for the delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been erroneous.'" *Id*. at 1069 (quoting *FDIC v. Mallen*, 486 U.S. 230, 242 (1988)). Because "[t]hat balancing test merely 'rephrase[s]' the *Mathews* test for cases alleging an unconstitutional delay in providing post-deprivation process," *ibid*. (second alteration in original) (quoting *DeVito v. Chi. Park Dist.*, 972 F.2d 851, 855 (7th Cir. 1992), the court's due process evaluation of IDOC's post-deprivation hearings mirrors the *Mathews* analysis for pre-deprivation hearings.

IDOC has a compelling interest in making accurate determinations about the risk of harm posed by parolee-child contact. Again, the court credits trial testimony, particularly from Brown-Foiles and Dr. Grosskopf, that accurate and reliable decisions require an evidentiary basis from which decisionmakers can evaluate a parolee's transition to community life. Given the need for IDOC to collect post-release information in order to make a reasoned and accurate risk assessment regarding parent-child contact, IDOC has offered a compelling justification for a twenty-one-day delay in making an initial determination. That compelling justification would outweigh the other *Mathews* factors even if those factors weighed in Plaintiffs' favor. It follows that due process does not require more prompt post-deprivation hearings and initial decisions than those provided by IDOC policy.

### B.    Criteria Used to Evaluate Child Contact Requests

As noted, the remaining aspects of Plaintiffs' child contact criteria claim challenge, on substantive due process grounds, three criteria the containment teams use to evaluate requests for

parent-child contact: (1) the parolee's not having taken a polygraph; (2) insufficient duration of therapy; and (3) the parolee's noncompliance with conditions of parole. 565 F. Supp. 3d at 1069-74.

### 1. Polygraph Requirement

IDOC policy allows therapists to condition parent-child contact recommendations on a parolee's having taken and passed a polygraph examination. In denying IDOC's summary judgment motion as to this criterion, the court observed that, based on the undisputed record evidence, Plaintiffs "fail[ed] to raise a genuine dispute of material fact as to the validity, as a general matter, of IDOC's polygraph requirement." 565 F. Supp. 3d at 1071. The claim nonetheless proceeded to trial because a parolee who cannot afford to pay for a polygraph examination may be unable to receive approval for parent-child contact even if IDOC otherwise has no reason to deny the parolee's request. IDOC's summary judgment briefing failed to "articulate a legitimate governmental interest in denying parolees' contact with their children based on inability to pay for a polygraph." *Ibid*.

IDOC's post-trial submissions likewise fail to articulate or defend any state interest in conditioning parent-child contact in a parolee's ability to pay for a polygraph examination. Doc. 263 at 15-16; Doc. 267 (IDOC's closing argument). In fact, no trial evidence supports *any* rational connection between a parolee's ability to pay for a polygraph and a risk of harm from parent-child contact. *Cf. M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) (holding that a State could not condition an indigent parent's right to appeal a parental-rights termination on her ability to pay record preparation fees, in part because of the significance of parent-child relationships). (To the extent that Dr. Blain's testimony that he considers the ability to pay when assessing a parolee's risk profile could be construed to suggest that there is such a rational connection, the court finds that testimony wholly unpersuasive, as Dr. Blain did not articulate any basis for that suggestion.)

Thus, under the *Turner* standard, IDOC fails to "articulate [a] legitimate governmental interest in" denying child contact to an otherwise eligible parolee who cannot afford a polygraph and to "provide some evidence supporting [IDOC's] concern." *Riker*, 798 F.3d at 553 (internal quotation marks omitted); *see also Lashbrook v. Hyatte*, 758 F. App'x 539, 542 (7th Cir. 2019) ("At the outset we note that the application of the *Turner* factors may require defendants to produce evidence that justifies the[ir] policies.").

IDOC argues that Plaintiffs fail to show that the polygraph payment condition "is unconstitutional in all of its applications," making a facial challenge inappropriate. Doc. 263 at 15-16. True enough, "[u]nder the most exacting standard the [Supreme] Court has prescribed for facial challenges, a plaintiff must establish that a law is unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (internal quotation marks omitted). "But when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct." *Ibid*. Thus, "[t]he proper focus of constitutional inquiry is the group for whom the [policy] is a restriction, not the group for whom the [policy] is irrelevant." *Ibid*. (internal quotation marks omitted); *see also Fields v. Smith*, 653 F.3d 550, 557 (7th Cir. 2011) (same). The appropriate frame here, then, is not whether the polygraph payment condition is unconstitutional as to parolees whose therapists do not require a polygraph or parolees who can afford one, but whether parolees (like Molina) who cannot afford a polygraph may be denied parent-child contact based solely on their inability to pay.

Viewed under that frame, the policy is unconstitutional. When a sex offender therapist requires a polygraph that a parolee cannot afford, IDOC effectively conditions parent-child contact on the parolee's ability to pay. The court can declare unconstitutional that aspect of the

27

policy, even though IDOC's formal, written procedures do not explicitly address parolees' ability to pay. *Cf. Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1039 & n.2 (7th Cir. 2017) (affirming a preliminary injunction of an "unwritten" government policy), *abrogation on other grounds recognized in Ill. Repub. Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). In fact, it is the policy's omission of any mechanism addressing ability to pay for a polygraphs that makes the criterion unconstitutional as to class members who cannot afford one.

Thus, the court declares the polygraph criterion unconstitutional to the extent it allows IDOC to deny a child-contact request based solely on the parolee's failure to take a polygraph examination if the parolee cannot afford an examination. In such circumstances, IDOC must (a) provide financial assistance to the parolee such that the parolee reasonably can afford a polygraph examination offered by a privately employed polygraph examiner; (b) offer the parolee a polygraph examination by an IDOC-employed polygraph examiner at a cost that the parolee reasonably can afford; or (c) grant the parolee's child-contact request notwithstanding the absence of the polygraph examination. To be clear, these obligations do *not* apply when IDOC articulates another valid, independently sufficient ground for denying a child-contact request. IDOC must provide financial assistance or waive the polygraph requirement only when a class member's child-contact request otherwise would be denied *solely* because the class member has not taken a polygraph examination *and* cannot afford to pay for an examination.

In its closing argument, IDOC suggested that any relief requiring it to pay for polygraph examinations would subject it to a significant resource burden. Doc. 267. The *de minimis* burden standard is not implicated, however, because IDOC does not defend any legitimate interest in prohibiting child contact under the circumstances described above. And even if IDOC

had some legitimate interest, the financial and administrative burden of the court's declaration is *de minimis* relative to the overall costs of IDOC's supervision of sex offender parolees, given that the court's ruling applies only to those parolees for whom paying for a polygraph is the sole obstacle to parent-child contact. Although the trial evidence did not directly establish how many parolees fall into that category, the evidence suggested only about half of parolees have financial issues, and only a small number of parolees ever request child contact. And IDOC will have other, legitimate reasons justifying child-contact denials for some persons in that already small population, making any financial burden *de minimis*. Thus, declaratory relief is appropriate. *See Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.").

### 2. Insufficient Duration of Therapy

IDOC policy allows sex offender therapists to withhold recommendations for parent-child contact if a parolee has not enrolled in therapy for a sufficient duration. The summary judgment record did not disclose whether therapists' disparate practices regarding minimum time in therapy resulted in arbitrary denials of child-contact requests. 565 F. Supp. 3d at 1071-72. The trial evidence clarified that therapists exercise their professional judgment to make individualized assessments about the progress made by parolees in therapy, and that those assessments affect the required length of therapy. Even Dr. Harris, who appeared to have the most rigid duration requirement, clarified that if a parolee "has been [in contact with their] child while they were … incarcerated … I might think differently," Doc 255-2 at 13 (49:13-49:16), which suggests that she makes individualized assessments based on the available evidence. The court owes deference to therapists as medical professionals exercising their professional judgment. *See Washington v. Harper*, 494 U.S. 210, 230 n.12 (1990) (describing the deference

owed "to medical professionals … who possess, as courts do not, [certain] requisite knowledge and expertise").

As IDOC concedes, a therapist's exercise of discretion must "fall[] within acceptable professional standards." Doc. 263 at 17. The court understands that concession to mean that containment teams should not defer unquestioningly to a therapist's determination that further therapy is required, particularly if the therapist's practices appear to be an outlier among licensed sex offender therapists. And IDOC policy allows parolees to seek review of a therapist's determination by requesting an independent evaluation by an IDOC-employed therapist (such as Dr. Grosskopf), soliciting input from Brown-Foiles, or filing a formal appeal. Those processes sufficiently constrain individual therapists' discretion such that child-contact requests are not denied arbitrarily or irrationally. Accordingly, IDOC is entitled to judgment as to the duration of therapy criterion.

### 3. Noncompliance with Parole Conditions

As the court explained in its summary judgment opinion, "there is an indisputably logical relationship between a parolee's compliance with parole conditions and IDOC's interest in the parolee's rehabilitation." 565 F. Supp. 3d at 1073 (citing *Overton*, 539 U.S. at 133). Still, the summary judgment record did not establish "[t]he *strength* of the relationship" between the noncompliance criterion and IDOC's penological interest, as "there may be some relatively trivial parole violations that, even under the deferential *Turner* standard, would not warrant automatic denial of a request for parent-child contact." *Ibid*. As noted above, the court finds based on the trial evidence that IDOC does not deny parent-child contact based on trivial or minor parole violations, absent a pattern of noncompliance indicating the parolee will not abide by the parent-child contact conditions. IDOC is therefore entitled to judgment as to the noncompliance with parole conditions criterion.

30

## C. Neutral Decisionmaker

Finally, Plaintiffs mount a procedural due process challenge to the alleged absence of a neutral decisionmaker when IDOC decides whether to grant parent-child contact requests. "The *Mathews* test governs whether due process requires a neutral decisionmaker." 565 F. Supp. 3d at 1074 (citing *Felce*, 974 F.2d at 1496). The court's summary judgment opinion applied *Mathews* in evaluating the constitutional validity of IDOC's administrative appeals process but withheld summary judgment because record evidence regarding the burdens of changing IDOC's procedures was "inconclusive at best." *Id*. at 1074-75. In their closing argument, Doc. 267, Plaintiffs further contend that procedural due process requires a neutral initial decisionmaker at the containment team level. The court addresses each argument in turn.

### 1. Administrative Appeals

As the court held in its summary judgment opinion, Plaintiffs have "a 'significant' liberty interest … in enjoying the companionship of their children," so "[t]he first *Mathews* factor weighs heavily in favor of Plaintiffs." 565 F. Supp. 3d at 1074. As to the second factor, "the lack of an independent decisionmaker creates a significant risk of an erroneous deprivation of Plaintiffs' interests," *ibid*., while "[i]ndependence … provides a significant added dimension of procedural protection to the liberty interest at stake," *Felce*, 974 F.2d at 1500. Drawing all inferences in Plaintiffs' favor at the summary judgment stage, the court observed that "IDOC's appeal process does not provide for independent review of the containment team's decision" because the two individuals empowered to decide appeals—the Deputy Chief of Parole and Brown-Foiles—had individual interests in supporting the decisions of their respective subordinates. 565 F. Supp. 3d at 1074-75. With the first two *Mathews* factors favoring Plaintiffs, the claim proceeded to trial to determine the relative weight of the third factor: "the

fiscal and administrative burdens" accompanying the addition or substitution of an independent decisionmaker. *Id.* at 1075.

The trial evidence showed that fiscal and administrative burdens of providing an independent appellate decisionmaker are minimal, as evidenced by Brown-Foiles's testimony that either Williams or Wright will decide appeals if Brown-Foiles has a conflict of interest (more on that in a moment). IDOC does not contend otherwise. Doc. 263 at 26-28. Thus, the third *Mathews* factor, to the extent it weighs at all in IDOC's favor, is clearly outweighed by the first two factors. Accordingly, the court concludes that procedural due process requires a neutral, independent decisionmaker in evaluating child-contact requests.

That said, IDOC's administrative appeal procedure does not violate due process because it in fact provides for a neutral decisionmaker. In most cases, Brown-Foiles acts as an independent appellate decisionmaker because she does not supervise the containment team members who made the initial decisions and does not participate in the containment team's decisional process. *See Felce*, 974 F.2d at 1499 ("Of course, a decisionmaker need not be external to an institution to be independent."). In those uncommon situations where Brown-Foiles cannot be independent—because the containment team members solicited her advice regarding a parolee's child-contact request, because she supervises the sex offender therapist on the containment team, or for any other reason—a different appellate decisionmaker will replace her.[*] (As noted, such a situation has not yet arisen, but Plaintiffs cast no doubt on

_____

[*] In its summary judgment opinion, the court stated that Brown-Foiles could not be an independent appellate decisionmaker in those circumstances where she plays a supervisory role "to the structure of the treatment groups" or has "coordinate[d] trainings for [the] parole agents and therapists" who made the challenged child-contact decision. 565 F. Supp. 3d at 1075. On reflection, that statement was incorrect. Under the standard articulated in *Felce*, merely helping

Brown-Foiles's credible testimony describing the recusal process.)  Brown-Foiles identified two individuals who could serve in her stead: Williams and Wright.  Williams's neutrality is debatable given that she supervises Brown-Foiles.  565 F. Supp. 3d at 1074 ("[T]he reviewing officials in *Felce* … were held to be insufficiently independent because they formed a direct line of supervisors above the parole agent and thus had individual interests in supporting his decision.") (internal quotation marks and alteration omitted).  But Plaintiffs do not dispute Wright's neutrality.  Doc. 262 at 41-42.  Accordingly, because IDOC's administrative appeal process  allows Wright to step in for Brown-Foiles when Brown-Foiles has a conflict, the process provides for an independent, neutral appellate decisionmaker in all circumstances.

## 2.    Initial Decisions

Given that IDOC's process provides for an independent, neutral appellate decisionmaker, procedural due process does not also require an "independent evaluator," as Plaintiffs propose.  Doc. 267.  Of course, Plaintiffs have the same liberty interest at stake, so the first *Mathews* factor again weighs in their favor.  565 F. Supp. 3d at 1074.  But the second and third *Mathews* factors—the value of additional procedural safeguards and administrative burden—both weigh against Plaintiffs' position.  Given that parolees can always appeal initial decisions to an independent, neutral decisionmaker, the probable value of additional safeguards at the initial decision level would be minimal.  *Cf. Felce*, 974 F.2d at 1499-1500 (invalidating a procedure that, among other things, included "no provision for review by persons not currently involved in

---

to structure treatment in general or coordinating a parole agent's or therapist's training does not give Brown-Foiles an impermissible stake in supporting an agent's or therapist's child-contact decision.  *See Felce*, 974 F.2d at 1499 (holding that a person "involved in [the plaintiff's] diagnosis and treatment" could not be independent for purposes of a procedural due process analysis, and making clear that "a decisionmaker need not be external to an institution to be independent").

[the parolee's] diagnoses or treatment").  Moreover, no evidence suggests that IDOC has

independent evaluators who could be added to or substituted for the containment without

substantial administrative and financial burdens.  The court therefore concludes that, on balance,

the *Mathews* test does not require displacing the containment team or any member thereof in the

initial decisionmaking process.  *See Harper*, 494 U.S. at 235 (indicating that courts should

"avoid unnecessary intrusion into either medical or correctional judgments") (internal quotation

marks omitted).

## Conclusion

On the class claims tried at the bench trial, the court will enter judgment in IDOC's favor

with two exceptions.  First, the court declares unconstitutional IDOC's child-contact policy for

parolees convicted of sex offenses insofar as IDOC fails to offer parolees a process by which

they may submit to the containment team written communications addressed to their child(ren)

for review and decision within seven calendar days.  Second, the court declares IDOC's policy

unconstitutional insofar as it allows IDOC to deny parolee-child contact based solely on the

parolee's failure to take a polygraph examination where the parolee cannot afford an

examination.  The court declares that, in such circumstances, IDOC must (a) provide financial

assistance to the parolee such that the parolee reasonably can afford a polygraph examination

offered by a privately employed polygraph examiner; (b) offer the parolee a polygraph

examination by an IDOC-employed polygraph examiner at a cost that the parolee reasonably can

afford; or (c) grant the parolee's child-contact request notwithstanding the absence of the

polygraph examination.

No injunction is necessary at this juncture.  "[I]nstitutional reform injunctions often raise

sensitive federalism concerns," *Horne v. Flores*, 557 U.S. 433, 448 (2009), so a declaratory

judgment is preferable where, as here, the defendant state agency has been cooperative throughout the litigation. *See Badger Cath., Inc. v. Walsh*, 620 F.3d 775, 782 (7th Cir. 2010) ("If the entry of a regulatory injunction can be avoided by a simpler declaratory judgment, everyone comes out ahead.") (citing *Horne*, 557 U.S. at 447-50). If IDOC's posture changes absent a stay pending appeal or a reversal on appeal, "then more relief lies in store. For now, however, a declaratory judgment suffices." *Ibid*.

August 25, 2022

_____
                        United States District Judge